421 So.2d 597 (1982)
The INSURANCE COMPANY OF the STATE OF PENNSYLVANIA, a Foreign Corporation, and Cavico Aircraft Sales, Inc., a Florida Corporation, Appellants,
v.
The ESTATE OF Frank GUZMAN, Deceased, by Its Personal Representative Linda Guzman and Linda Guzman, Individually and Lauderdale Air Taxi, Inc., a Florida Corporation, Appellees.
No. 80-2121.
District Court of Appeal of Florida, Fourth District.
October 13, 1982.
Rehearing Denied November 30, 1982.
*598 John Murray and Joan S. Buckley of Walton, Lantaff, Schroeder & Carson, Miami, for appellants.
Thomas F. Luken, Fort Lauderdale, for appellees.
GLICKSTEIN, Judge.
Appellee, Lauderdale Air Taxi, Inc., was awarded a final judgment of $80,000 against appellants following a jury verdict.[1] *599 The judgment compensated appellee for the loss of its aircraft while it was in the custody and control of Cavico Aircraft Sales, Inc., appellant. The action went to trial upon a two count complaint, later amended by stipulation. One count alleged a bailment relationship in which appellee delivered the plane to Cavico for avionics (radio) repairs and Cavico failed, and refused, to redeliver it. The second count alleged the aircraft was stolen due to Cavico's negligence in failing to take adequate precautions against theft. Appellants claim the trial court made numerous erroneous rulings concerning the admissibility of certain evidence and jury instructions. We agree and reverse and remand the cause accordingly.
The facts are shadowy, bizarre and, in large measure, disputed. Frank Guzman owned Lauderdale Air Taxi, Inc. In March of 1979 he purchased for $80,000 in cash a DC-4 plane from a military surplus aircraft dealer located in Arizona. Once ferried to Fort Lauderdale, the plane was delivered on April 25th to Cavico, a fixed-base operator at Fort Lauderdale-Hollywood International Airport, for radio repairs. On May 2nd Guzman told his common law wife, Linda, that he was going to a meeting at a motel to sell the aircraft for $100,000 in cash. He was murdered on that date.
On May 9th, at approximately 2:30 p.m., someone manned the aircraft and flew it away. Frank Guzman, Jr., reported the aircraft as stolen. The report listed Emil Garske[2] as a witness. In appellee's case in chief, Garske testified that on the day the aircraft was taken he saw people wandering around it. After going to the telephone to call Guzman's attorney, he returned to the plane to find it missing. Linda Guzman, now known as Linda Shea, testified that she assumed control of Guzman's affairs immediately upon his death[3] and did not authorize anyone to remove the aircraft from Cavico's premises.
Appellants' sole witness, Leland Cameron, portions of whose deposition were read to the jury, testified that he was a retired airline captain who was now in the airplane and parts business in California. He admitted he flew the aircraft from Cavico but claimed he did not steal it. He intended to fly the plane to Georgia to have additional equipment installed in order to satisfy a customer he had who was interested in purchasing the plane. He said someone in Tucson had told him of the aircraft. Once Cameron completed a title search, the report of which he produced at trial, he contacted appellee and talked to Roy Elder and B.H. Sandini, whom he knew as agents acting in appellee's behalf. Cameron testified Elder authorized the flight to Georgia and provided him with a photocopy of a bill of sale, airworthiness certificate, and application for registration, all of which Cameron had with him on May 9th. Elder and he were negotiating the purchase of the aircraft for $82,000 with the resale to be for $90,000. Cameron further said that he reached the aircraft by entering a gate north of the Bush Aviation Building, a gate not under the control of Cavico, and spoke to Elder for a short time before taking off.
On rebuttal, appellee offered evidence that Sandini dealt in stolen motor vehicles. The parties stipulated Elder had died before trial. Counsel read additional portions of Cameron's deposition wherein the deponent testified that James Butler and Christopher Broderick accompanied him on the flight as co-pilot and flight engineer. While the aircraft was in flight forty miles west of Cross City, Florida, and over the Gulf of Mexico, Cameron explained an electrical fire caused him to ditch the aircraft, forcing the three-some *600 into a small raft. The aircraft was lost and a freighter eventually rescued the group and took them to Mexico.
To destroy Cameron's credibility and to create an inference that the aircraft was stolen, appellee placed Broderick on the stand, knowing he would invoke his fifth amendment privilege against self-incrimination when asked if he had stolen the aircraft from Cavico's premises. Testimony of Garske, a pilot himself, was read, establishing that the aircraft burned 200 gallons of fuel an hour and that a flight from Fort Lauderdale to Georgia would not put the aircraft over the Gulf of Mexico at anytime.
Because access to the aircraft was an important issue, there was considerable testimony with respect to the security requirements imposed on Cavico and the precautions actually taken. As a tenant of county-owned premises, Cavico must maintain the high chain link fence that surrounds its perimeters. Large signs on its gates warn against trespassing. Cavico must also lock its access gates after hours; during normal business operations, either monitoring or locking the gates is a permissible way of detering unauthorized entry.
The county also requires its tenants to utilize a badge identification system. Unbadged personnel are to be under the surveillance and escort of authorized personnel during any period in which they are in the Air Operations Area. If an unfamiliar face appears on the premises, Cavico employees are to request appropriate identification. Cavico has an obligation to inform its employees of these procedures.
Access to the aircraft again surfaced in testimony referring to a dispute over whether payment for the repair work had occurred. (Payment would have terminated the bailment arrangement.) Cavico's general manager, Gilbert Vince, testified someone paid appellee's bill of $4,789.04 in cash. In return for the payment, this unidentified individual received a key to the padlock on the aircraft. Guzman, Vince testified, kept telling him he would reclaim the DC-4. When no one showed up, Cavico personnel had to move the plane from in front of Cavico's hangar to a spot on the ramp, where the larger planes are stored.
Appellee attacked this testimony with a number of facts and assertions. First, Vince admittedly could not identify the payor. Second, an officer of Cavico testified that when the plane took off, Vince called her to ascertain whether the bill had been paid, thus raising doubts about the veracity of his testimony. Third, and perhaps most damaging, the chronology of events cast suspicion on Vince's testimony: Cavico received the plane on April 25th; evidence showed the installation work took approximately one week, or until May 2nd, the date of Guzman's death. Vince testified that after he received payment, about two days after he said he told Guzman the work was completed, he spoke to Guzman again about reclaiming the plane. Vince also testified Guzman went to Cavico (after May 2nd) to order more radios.
We now address the four principal issues on appeal.

I
Appellants argue the trial court erred in instructing the jury as to the rebuttable presumption that exists in a bailment relationship because they presented credible evidence to rebut the presumption.[4] We agree, but our decision requires that we first explain why this type of presumption is sometimes classified as a vanishing presumption.
*601 Prior to the enactment of the Florida Evidence Code,[5] courts explained a presumption as
an inference required by a rule of law to be drawn as to the existence of one fact from the existence of some other established basic fact or combination of facts.
Caldwell v. Division of Retirement, 372 So.2d 438, 440 (Fla. 1979). As Caldwell notes, two types of presumptions are recognized in Florida. One type is the vanishing presumption.
A presumption is a rule of law which attaches to certain evidentiary facts and is productive of certain procedural consequences. The presumption is not itself evidence and has no probative value. Florida follows generally [albeit not always] what is sometimes called the Thayerian rule to the effect that when credible evidence comes into the case contradicting the basic fact or facts giving rise to the presumption, the presumption vanishes and the issue is determined on the evidence just as though no presumption has ever existed. Conversely, if the basic facts are sufficiently proven so as to give rise to the presumption and not thereafter contradicted by credible evidence, the party in whose favor the presumption exists becomes entitled to a directed verdict. Thus, in either event, the presumption is productive of these procedural consequences but is not a matter for the jury to consider.
Id. at 440, quoting Nationwide Mutual Insurance Co. v. Griffin, 222 So.2d 754, 756 (Fla. 4th DCA 1969).
Another type of presumption affects the burden of proof. These implement some social policy of the state. As discussed in Caldwell,
[w]hen evidence rebutting such a presumption is introduced, the presumption does not automatically disappear. It is not overcome until the trier of fact believes that the presumed fact has been overcome by whatever degree of persuasion is required by the substantive law of the case.
Id.[6]See also Gulle v. Boggs, 174 So.2d 26 (Fla. 1965); Hinson v. Hinson, 356 So.2d 372 (Fla. 4th DCA 1978).
In Reserve Insurance Co. v. Gulf Florida Terminal Co., 386 So.2d 550 (Fla. 1980), the Supreme Court of Florida discussed the burden of proof resting on a plaintiff seeking recovery for lost or stolen goods entrusted to a bailee. The court explained:
Under the common law a bailor could establish a prima facie case of negligence by showing that goods were not returned in the same condition as they were delivered; however, the bailor continued to have the burden of proving his case by the preponderance of the evidence.
Id. at 551. In Reserve the court upheld the constitutionality of a statute which does not apply here, but the language used in that opinion supports appellants' position. *602 Moreover, it comports with Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 110-11, 62 S.Ct. 156, 160-61, 89 L.Ed. 89 (1941), which held the burden of persuasion in a bailment starts and remains upon the bailor.
Guided by the foregoing principles, we reach the following conclusions. First, the burden of proof in the strict sense always remains on the party initially having it. Second, presumptions affecting the burden of proof declare or implement some strong social policy of the state, like the validity of a marriage,[7] or the legitimacy of a child.[8] Third, presumptions affecting the burden of producing evidence facilitate the determination of the issues. These presumptions negate the necessity of proof in the absence of contradictory evidence. The language in Reserve, the holding of Commercial Molasses, compels us to classify the presumption of negligence in a bailment situation within the vanishing presumption category.[9]
Once the presumption has been appropriately classified, it is clear to see the trial court erred. If appellants did, as they claim, introduce evidence contradicting the presumption, the presumption should have vanished from the case. On the other hand, if appellants failed to rebut the inference of negligence, the court should have entered a directed verdict in favor of appellee. Instead, the trial court denied appellee's motion for a directed verdict and gave the erroneous instruction.

II
The trial court admitted into evidence letters written on behalf of Broward County informing Cavico that it had breached airport security on numerous occasions. Attached to the letters were reports filed by the County Sheriff's Office documenting instances in which the gates to Cavico's premises had been found unlocked. Most of the reports circumstantiated security violations that had occurred at night after normal business hours, although a few reports related instances of unlocked gates during the day. The court also admitted an identification badge issued by the county, which was to be worn by employees of the tenants of the airport premises. Testimony was given to the effect that Cavico employees did not wear the badges in May of 1979.
In order to get the reports and correspondence admitted, appellee first read into evidence, without objection, a brief portion of the deposition of Keith Schnable, Cavico's president. When questioned about Cavico's responsibilities under its leasing agreement with Broward County, Schnable testified as follows:
It was standing orders in our hours of operation that our gates were always secured and locked. The walk through gates were left open under the control of line service for entrance in and to the flight area. But during normal working hours we adhered to the locking of the gates, and when we left secured for the evening all gates with a positive check. The last line crew member should secure all our responsible gates, which was done.
Appellee then offered into evidence the reports and correspondence which the trial judge admitted over objection stating:
I think it is appropriate at this point to mention that these exhibits are being introduced into evidence for the purpose of impeaching the testimony read to you from the deposition of Mr. Schnable.[10]
The trial court, in its ruling, relied upon Lawrence v. Florida East Coast Railway, 346 So.2d 1012 (Fla. 1977). Lawrence involved an action arising out of the death of a motorist who was killed in an automobile-train collision at a railroad crossing. The *603 supreme court held that evidence of similar gate malfunctions at other railroad crossings should not have been excluded under an impeachment rule. Turning to the question of admissibility, the court discussed the evidence's relevancy.
Although no injuries resulted from the other gate malfunctions, we believe the evidence of their occurrence was relevant for showing notice of a defective system, provided the proper predicate of similarity was established. An ironclad rule of what constitutes similarity would most likely defeat the administration of justice. Therefore, we think determinations of whether a proper predicate of similarity exists should be left to the sound discretion of the trial judge. Some of the guidelines for determining similarity in cases such as this one are the other gate malfunctions closeness in time to the alleged malfunction in the litigated accident, the frequency of the other malfunctions and, of course, the substantial similarity in the type of signal systems at the various crossings. In this case the trial judge acted within proper limits of discretion since his determination that a predicate of similarity existed was founded on the fact that three reported instances of gate malfunctions in signal systems, substantially the same as the system at the King's Street crossing, had occurred within ninety days of Mr. Lawrence's accident.
Id. at 1015.
Relying on the guidelines enunciated in Lawrence, we consider the evidence of daytime violations was properly admitted. We also agree that the evidence concerning the failure of Cavico employees to wear their identification badges was relevant to the issue of Cavico's negligence. Concerning the reports of after-hours violations, we feel the evidence should have been excluded because its probative value did not outweigh the prejudice caused to appellants by its admission. We base our conclusion on the following: the lease agreement entered into by the county and Cavico recited that during business hours the access gates need not be locked; monitoring was sufficient. Because the nighttime security measures differed from those required during the day, we fail to see the relevance of these reports, particularly since Cavico's president admitted in his deposition knowledge of them.[11] Any relevance that did exist was further diminished by the fact that the only evidence in the record concerning Cameron's access to the premises showed he did not enter through Cavico's gates.

III
The trial court permitted appellee, over appellants' objection, to call Christopher Broderick to the stand after appellee had informed the court the witness had indicated he would not testify. Once called, Broderick was asked by appellee if he had stolen the DC-4 aircraft from Cavico's premises. As expected, he invoked the fifth amendment. Appellee's counsel then indicated he had no further questions. Appellants contend it was error to call Broderick to the stand for the sole purpose of having him claim his fifth amendment privilege. We agree.
In Faver v. State, 393 So.2d 49 (Fla. 4th DCA 1981), this court held the trial court properly refused defense counsel's request to call a witness to the stand for the purpose of having the witness invoke his fifth amendment privilege before the jury. In so doing, we quoted from United States v. Johnson, 488 F.2d 1206, 1211 (1st Cir.1973), which held:
Neither side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him.
One of the reasons for this prohibition lies in the recognition

*604 [t]hat a witness's invoking the Fifth Amendment in the presence of the jury will have a disproportionate impact on their deliberations.
Bowles v. United States, 439 F.2d 536, 541 (D.C. Cir.1970) (en banc), cert. denied, 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971). Another reason rests upon the conclusion that an inference from a witness's refusal to testify may add critical weight to a plaintiff's case in a form not subject to cross-examination. Fletcher v. United States, 332 F.2d 724 (D.C. Cir.1964). In the present case, Broderick's invocation of his privilege raised the inference that he, along with Cameron, stole the aircraft. Because Cameron's testimony was critical to appellants' defense, allowing Broderick to take the stand without providing an adequate opportunity for cross-examination unfairly prejudiced appellants.
Appellee argues the rule recognized in Baxter v. Palmigiano, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), applies to the facts of the present case. In Baxter the Supreme Court wrote:
[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by a party to a civil cause."
Id. at 318, 96 S.Ct. at 1557, quoting 8 J. Wigmore Evidence § 439 (McNaughton rev. 1961).
Baxter, however, is clearly distinguishable. In this case, Broderick was not a party to the proceeding; therefore, no probative evidence could have been offered against him.[12] What Baxter recognizes is that a party may not assert the privilege against self-incrimination as both a sword and a shield. City of St. Petersburg v. Houghton, 362 So.2d 681 (Fla. 2d DCA 1978). We fail to see how the language in Baxter and the rationale behind it could extend to a situation in which a witness other than a party is called to the stand for the sole purpose of invoking his right to remain silent before the jury.
Although we disapprove of what occurred at trial, we believe it is worthwhile to call to the parties' attention that had one been requested, a cautionary instruction regarding improper inferences would have been appropriate. Faver, 393 So.2d at 51. Furthermore, when this case was tried in early October of 1980, appellee's counsel argued to the jury that he had just learned of Cameron in September. Thus, although our decision presents one problem, it certainly provides counsel with an opportunity to obviate another.

IV
The trial court refused to give a jury instruction on the issue of comparative negligence.[13] Although failure to so instruct may constitute error, Grant v. Red Lobster Inns of America, Inc., 292 So.2d 372 (Fla. 4th DCA 1974), appellee argues the objection was waived by appellants' failure to file a written request pursuant to Florida Rule of Civil Procedure 1.470(b).[14]
*605 Admittedly, appellants' attorney did not submit a formal written instruction; but such a gesture would have been useless under the present circumstances. The record reveals the lawyer orally requested an instruction on comparative negligence, which the trial judge refused. Counsel then voiced his objection "[f]or the record."[15]
It is obvious from the transaction the trial court considered and rejected appellants' claim. The issue was properly preserved for appellate review by counsel's oral objection to the trial judge's proposed instruction. No purpose would have been served by requiring the lawyer to file a written request for an instruction which the judge already stated she would not give. Corbett v. Dade County Board of Public Instruction, 372 So.2d 971, 974-75 n. 3 (Fla. 3d DCA 1979), cert. denied, 383 So.2d 1192 (Fla. 1980). Because the case must be retried, this issue should be considered.
The record indicates the lower court refused to give the requested instruction because it did not want to confuse the jury on the various standards of negligence and gross negligence. The latter standard applies to a gratuitous bailment arrangement, Martin v. Bell, 368 So.2d 600 (Fla. 1st DCA 1978), which is how appellants characterized their arrangement with appellee. What the trial judge failed to consider is that the case went to the jury on two counts  bailment and negligence. As the court itself observed, the issue of Cavico's negligence was whether it had employed adequate security to protect the aircraft from theft. Facing this charge, appellants were entitled to counter it by an instruction and argument to the jury of the facts they contended established negligence on the part of Lauderdale Air Taxi, Inc.
Based on all of the foregoing, we reverse and remand for a new trial.
REVERSED AND REMANDED.
DELL, J., concurs.
BERANEK, J., concurs specially; dissents in part with opinion.
BERANEK, Judge, concurring specially; dissenting in part:
Basically, a plane titled in a corporation was bailed to a fixed-base operator for the purpose of radio repairs. About one week later, the individual who owned all stock in the corporation was murdered and another week later, the plane was allegedly stolen from where it was parked on the runway adjacent to the fixed-base operator's place of business. Eventually, the corporate owner made demand for the plane's return. After the demand was refused, the corporate owner sued the base operator in two counts, alleging in Count I bailment and a refusal to return the bailed article, and Count II negligence in allowing the plane to be stolen. After a jury trial, a general verdict of $80,000 was returned in plaintiff's favor and judgment was entered from which defendant appeals raising six issues. I would reverse the case because I conclude that a directed verdict in defendants' favor was appropriate. I believe the evidence was insufficient to take the case to the jury. The real issues were whether Mr. Elder had *606 apparent authority to entrust the plane to Mr. Cameron and whether the bailment of the plane had been terminated. I believe there was no real jury issue on these issues. The only evidence was that Elder was an apparent agent of the corporation and further that the bailment had been terminated by payment of the bill for radio repairs.
I also wish to specifically dissent from the majority view regarding error in allowing plaintiff to call Mr. Broderick who took the Fifth Amendment before the jury. This is a civil case. The defendants presented the testimony of Mr. Cameron who testified that he and Broderick were the pilot and flight engineer of the flight and that they did not steal the plane. The majority concludes that the plaintiff could not present Mr. Broderick's testimony on rebuttal because it was known he intended to take the Fifth Amendment when asked whether he had been involved in the theft of the aircraft. I submit that if defendants could call Cameron to testify that he and Broderick did not steal the plane that plaintiff should have been allowed to place Broderick on the stand and to take advantage of the inference which occurred when Broderick refused to answer questions based on the ground that it would incriminate him. This is in accordance with my previous dissent in Faver v. State, 393 So.2d 49 (Fla. 4th DCA 1981). Once again, I conclude that there is no Fifth Amendment policy to be served by prohibiting a party from asking a witness appropriate questions under these circumstances. The witness has a privilege, under the Fifth Amendment, to refuse to answer such questions, but it should be a mere privilege not to answer rather than a prohibition against asking the question. As in Faver, I would adopt the views expressed by Judges Bazelon and Wright in their dissenting opinions found in Bowles v. United States, 142 U.S.App.D.C. 26, 439 F.2d 536 (D.C. Cir.1970) (en banc), cert. denied, 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971). I thus conclude the judgment should be reversed and a directed verdict entered for defendant.
NOTES
[1] The action was brought by the Estate of Frank Guzman, deceased, by its Personal Representative, Linda Guzman; Linda Guzman, individually; and Lauderdale Air Taxi, Inc. The trial court directed a verdict against all but the last named appellee on the ground that the corporation held record title to the aircraft in question.
[2] Garske incorporated Lauderdale Air Taxi in 1978, turned it over to Frank Guzman in January of 1979, and apparently had done some work for the corporation thereafter. The day following Guzman's death, Garske and Guzman's attorney made sure that Lauderdale Air Taxi's office and hangar were locked.
[3] She was appointed personal representative of the estate on May 18, 1979.
[4] The judge, in tracking the language used in Clermont Marine Sales, Inc. v. Harmon, 347 So.2d 839 (Fla. 2d DCA 1977), gave the following instruction:

Given delivery of the bailed chattel and a failure to return it in accordance with the terms of the bailment agreement, a presumption of negligence on the part of the bailee arises unless he satisfactorily explain [sic] such failure or loss  pardon me, such loss, damage or disappearance of the chattel. The law imposes on the bailee the burden of showing that he exercised the degree of care required by the nature of the bailment.
[5] The Florida Evidence Code does not apply to this case.
[6] The similarity between the new Florida Evidence Code sections and the conclusion in Caldwell is readily apparent.

Section 90.302, Florida Statutes (1979), provides:
Every rebuttable presumption is either:
(1) A presumption affecting the burden of producing evidence and requiring the trier of fact to assume the existence of the presumed fact, unless credible evidence sufficient to sustain a finding of the nonexistence of the presumed fact is introduced, in which event, the existence or nonexistence of the presumed fact shall be determined from the evidence without regard to the presumption; or
(2) A presumption affecting the burden of proof that imposes upon the party against whom it operates the burden of proof concerning the nonexistence of the presumed fact.
Section 90.303, Florida Statutes (1979), provides:
In a civil action or proceeding, unless otherwise provided by statute, a presumption established primarily to facilitate the determination of the particular action in which the presumption is applied, rather than to implement public policy, is a presumption affecting the burden of producing evidence.
Section 90.304, Florida Statutes (1979), provides:
In civil actions, all rebuttable presumptions which are not defined in s. 90.303 are presumptions affecting the burden of proof.
[7] McMichael v. McMichael, 158 Fla. 413, 28 So.2d 692 (1947).
[8] Sacks v. Sacks, 267 So.2d 73 (Fla. 1972).
[9] Contra, Gard, Florida Evidence § 3:14 (2nd ed. 1980).
[10] The trial court expressed concern that in the absence of the sheriff's reports and correspondence between the county and Cavico, the jury, hearing only Schnable's deposition, would conclude the gates were always locked, which they were not.
[11] Although appellants did not request appellee at the October 10th bench conference to read any other part of Schnable's deposition pursuant to Florida Rule of Civil Procedure 1.330(a)(4), they did point out at a similar conference on October 8th that Schnable acknowledged receipt of the correspondence from the county "about every third day."
[12] The authorities upon which appellee relies also involved parties. For example, in Fross v. Wotton, 3 Cal.2d 384, 44 P.2d 350 (1935), an inference of fraud was permissible from defendants' refusal to testify in an action to set aside conveyances allegedly defrauding creditors. In Shepherd v. Superior Court of Alameda County, 17 Cal.3d 107, 550 P.2d 161, 130 Cal. Rptr. 257 (1976), the "witnesses" were three defendant police officers. Our research reveals that in a number of cases, although the courts use the term "witness," it is the party who is the witness. Molloy v. Molloy, 46 Wis.2d 682, 176 N.W.2d 292 (1970); Ikeda v. Curtis, 43 Wash.2d 449, 261 P.2d 684 (1953).
[13] Appellants claimed appellee was negligent in failing to reclaim the aircraft after the repairs were made. Aside from the failure to retrieve the DC-4, appellants also argued Elder and Sandini were vested with the apparent authority to transact business for appellee concerning the sale of the aircraft.
[14] Florida Rule of Civil Procedure 1.470(b) provides that "[n]ot later than at the close of the evidence, the parties shall file written requests that the court charge the jury on the law set forth in such requests."
[15] The following dialogue occurred:

THE COURT: Have we got comparative negligence?
ANSWER: I think so. I think the action of the corporation and its employees from this agent after Mr. Guzman's death when they knew that the aircraft was there, they continued to leave it there and I think that is sufficient to have the jury apportion some negligence in this case.
THE COURT: Well, but we can't have it both ways. If they determine that the gratuitous bailment requires gross negligence, then that would dispel the theory of comparative negligence. I mean, it is either negligence or gross negligence. I don't think you can have both philosophies. They seem to me to be a little contradictory.
You are nodding yes, but you are not saying anything to get it on the record.
ANSWER: I don't want to get it on the record.
THE COURT: All right. Then let's do away with that. I think it will confuse things if we've got it already covered with negligence or gross negligence.
ANSWER: For the record I'll object because I think that the testimony is sufficient for the jury to apportion the negligence between the plaintiff and the defendant.