PER CURIAM.
This case is before the Court for review of the decision of the Second District Court of Appeal in Warfel v. Universal Insurance Co. of North America, 36 So.3d 136 (Fla. 2d DCA 2010). In its decision, the district court certified a question of great public importance to this Court. See id. at 138-39. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
FACTS AND PROCEDURAL HISTORY
In March 2005, Universal Insurance Company of North America (Universal) issued an all-risks homeowners insurance policy, which covered sinkhole claims, to Michael Warfel. See Warfel v. Universal Ins. Co. of N. Am., 36 So.3d 136, 136 (Fla. 2d DCA 2010). After the policy was issued, effective June 1, 2005, the Florida Legislature restructured the statutory scheme pertaining to the sinkhole claim process with regard to database information, testing standards, and reporting requirements. See id. The Legislature amended sections 627.706 and 627.707, Florida Statutes (2005), and enacted sections 627.7065, 627.7072, and 627.7073, Florida Statutes (2005). The sinkhole statutes appear in chapter 627, titled “Insurance Rates and Contracts,” specifically in Part X, titled “Property Insurance Contracts.” Section 627.707(2) requires insurance companies, upon receipt of a claim for sinkhole damage, to hire a professional engineer or a professional geologist to conduct testing to determine the cause of the loss and issue a report. Section 627.7073 governs those sinkhole reports, and subsection (l)(c) of that section provides:
The respective findings, opinions, and recommendations of the engineer and professional geologist as to the verification or elimination of a sinkhole loss and *50 the findings, opinions, and recommendations of the engineer as to land and building stabilization and foundation repair shall be presumed correct.
§ 627.7073(l)(c), Fla. Stat. (2005).
In August 2005, Warfel filed a sinkhole claim with Universal, which subsequently hired a geotechnical, geological, and engineering firm, SD II Global (SD II), to investigate the claim. See Warfel, 36 So.3d at 136. SD II produced a report that expressed an opinion that the damage was caused by shrinkage, thermal stress, and differential settlement, all of which were excluded from coverage under the policy. See id. at 137. Relying on the report, Universal denied the claim. See id.
Warfel subsequently filed an action against Universal for breach of contract seeking the recovery of insurance benefits for the loss. See id. Before trial, Universal moved the trial court to apply the sinkhole statutes that became effective on June 1, 2005. See id. The trial court denied Universal’s motions with regard to sections 627.706 and 627.707 because it found that those amendments were substantive and did not apply retroactively. See id. at 137 n. 2. However, the trial court granted Universal’s motion to apply sections 627.7065, 627.7072, and 627.7073 retroactively, reasoning that the statutes were procedural. See id. at 137 n. 2.[1] Universal also moved to apply section 90.304, Florida Statutes (2007), and requested that the jury be instructed that the presumption of correctness as articulated in 627.7073(l)(c) was a rebuttable presumption affecting the burden of proof. See id. at 137. Again, over Warfel’s objection, the trial court granted Universal’s motion and request. See id.
During trial, both parties presented expert testimony with regard to the cause of damage to Warfel’s home. See id. The experts for Warfel concluded that a sinkhole, at least in part, caused the damage to Warfel’s home. See id. The experts for Universal, each affiliated with SD II, concluded that sinkhole activity did not damage the home. See id. Throughout the trial, Warfel repeatedly asserted that the presumption created in section 627.7073(l)(c) was a “vanishing” or “bursting bubble” presumption governed by section 90.303, Florida Statutes (2005), whereas Universal contended that the presumption in that statute should be governed by section 90.304 because it implements public policy relating to a sinkhole insurance crisis. See id. at 138.
At the conclusion of the presentation of evidence, the trial court instructed the jury as follows:
You must presume that the opinions, findings, and conclusion in the SD II report as to the cause of damage and whether or not a sinkhole loss has occurred are correct. This presumption is rebuttable. The Plaintiff has the burden of proving by a preponderance of the evidence that the findings, opinions, and conclusions of the report are not correct.
Id. However, during closing arguments, Universal told the jury that the jury
must presume that the opinions, findings, and conclusions in the SD II report as to the cause of damage and whether or not a sinkhole loss has occurred are correct. You must presume that report is correct. That report is the only report in evidence. You can take it back in the room. Read it. You will pre *51 sume — the Judge will instruct you you [sic] must presume that’s correct.
Id. The jury returned a verdict in favor of Universal, and after denying Warfel’s motion for a new trial, the trial court entered a final judgment in favor of Universal.
On appeal, the Second District Court of Appeal reversed. The appellate court held that there was no legislative expression that public policy compels a homeowner to shoulder the burden to disprove the report and opinions of the insurer’s engineers and geologists. Id. at 138. Further, the Second District noted that it was “also mindful that, historically, an all-risks policy encumbers the insurer with the burden to prove that a claimed loss is not covered.” Id. (citing Wallach v. Rosenberg, 527 So.2d 1386, 1388-89 (Fla. 3d DCA 1988)). Finally, the court noted that the Legislature “knows how to create burden-shifting presumptions under section 90.304,” but did not do so in section 627.7073(l)(c). See id. at 138-39. The Second District ultimately held that “[b]ecause the trial court misapplied the presumption at work in this case and gave the jury an instruction improperly shifting the burden of proof, a new trial is required.” Id. at 140. Further, the court certified the following question to this Court as one of great public importance:
DOES THE LANGUAGE OF SECTION 627.7073(1)(C) CREATE A PRESUMPTION AFFECTING THE BURDEN OF PROOF UNDER SECTION 90.304 OR DOES THE LANGUAGE CREATE A PRESUMPTION AFFECTING THE BURDEN OF PRODUCING EVIDENCE UNDER SECTION 90.303?

Id.

This review followed.
BACKGROUND
The central question here is whether the burden shifting presumption articulated in section 90.304 of the Florida Evidence Code applies to the presumption provided in section 627.7073(l)(c). The answer to this question requires an understanding of both the presumption and sinkhole statutory schemes in Florida.

Presumptions Background

Thayer-Wigmore v. Morgan-McCormick

Prior to the adoption of the Federal Evidence Code, there were two major schools of thought with regard to the procedural effect of a presumption in the face of rebutting evidence: the “Thayer-Wig-more” view and the “Morgan-McCormick” view. See 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5126 (2005); see also In re Yoder Co., 758 F.2d 1114, 1119 (6th Cir.1985). Professors Thayer and Wig-more viewed presumptions as “devices of procedural convenience” that were efficient mechanisms for addressing inferences that arise from a basic fact in the absence of any evidence of the presumed fact. Wright & Graham § 5122.1, at 428. Under the Thayer-Wigmore approach, “once the opponent introduced evidence showing the non-existence of the presumed fact, the presumption dropped out of the case.” Id. (emphasis supplied). An unre-butted presumption, however, entitled its proponent to a directed verdict on the presumed fact under this approach. See id. Presumptions that follow this school of thought have come to be known as “bursting bubble” presumptions. See id.
Professors Morgan and McCormick posited that presumptions should be given greater effect than they were afforded under the Thayer-Wigmore approach. See id. at 430. Under this theory, “contrary evidence on the presumed [fact] does not dissipate the presumption; it simply satis *52 fies the opponent’s burden of production and sends the case to the jury with an instruction that the burden of persuasion is on the opponent.” Id. at 431. Presumptions under this theory shift the burden of persuasion and afford courts the ability to tweak the weight of the burden shifted to fit more closely with the underlying social policy advanced by the presumption. See id. Both the Thayer-Wigmore approach and the Morgan-McCormick view provide for a directed verdict on a presumed fact if such fact goes unrebutted. The fundamental difference between the two views stems from the impact of rebutting evidence upon a presumption in the face of rebutting evidence: the former requires the presumption to vanish, whereas the latter still presents the presumption to the trier of fact to decide if the contradicting evidence overcomes the presumption.
Many states viewed the Thayer-Wig-more presumption as “too weak” and the Morgan-McCormick presumption as “too strong.” See id. at 432. Professor Francis H. Bohlen suggested a third approach which provided that rather than a single effect for all presumptions, “presumptions should be grouped into several different classes according to the policies they served and each class assigned an effect commensurate with the strength of the policy of the presumptions it encompassed.” Id. California ultimately adopted a simpler approach that featured only two classes: one followed the Thayer-Wigmore approach and the other followed the Morgan-McCormick approach. See id. at 433.

Florida Adoption of the California Two-Tiered System

Prior to the enactment of the Florida Evidence Code, the procedural effect given to presumptions in Florida was defined in a common law approach because presumptions had not yet been codified. See Ins. Co. of State of Pa. v. Estate of Guzman, 421 So.2d 597, 601 (Fla. 4th DCA 1982). In Nationwide Mutual Insurance Co. v. Griffin, 222 So.2d 754, 756 (Fla. 4th DCA 1969), the Fourth District Court of Appeal articulated the historical effect of presumptions prior to the enactment of the Florida Evidence Code:
A presumption is a rule of law which attaches to certain evidentiary facts and is productive of certain procedural consequences. The presumption is not itself evidence and has no probative value. Florida follows generally (albeit not always) what is sometimes called the Thayerian rule to the effect that when credible evidence comes into the case contradicting the basic fact or facts giving rise to the presumption, the presumption vanishes and the issue is determined on the evidence just as though no presumption had ever existed. Conversely, if the basic facts are sufficiently proven so as to give rise to the presumption, and not thereafter contradicted by credible evidence, the party in whose favor the presumption exists becomes entitled to a directed verdict. Thus, in either event, the presumption is productive of these procedural consequences but is not a matter for the jury to consider.
(Emphasis supplied.)
As acknowledged by the Fourth District in Nationwide, Florida courts sometimes deviated from the Thayer-Wigmore approach. In Caldwell v. Division of Retirement, 372 So.2d 438, 440 (Fla.1979), this Court discussed Nationwide and acknowledged that the Thayerian rule was the norm in Florida,[2] but also recognized *53 “[a]nother type of rebuttable presumption ... which affects the burden of proof. These are expressions of social policy.” The Court explained the other type of presumption as:
When evidence rebutting [a presumption that affects the burden of proof] is introduced, the presumption does not automatically disappear. It is not overcome until the trier of fact believes that the presumed fact has been overcome by whatever degree of persuasion is required by the substantive law of the case. This may be by a preponderance of the evidence or by clear and convincing evidence, as the case may be.
Id. at 440-41. Applying this standard to a statute that governed a presumption in favor of firefighters, the Court held:
The presumption contained in section 112.18(1), Florida Statutes (1975), affects the burden of persuasion. It embodies the social policy of the state which recognizes that firemen are subjected during their career to the hazards of smoke, heat, and nauseous fumes from all kinds of toxic chemicals as well as extreme anxiety derived from the necessity of being constantly faced with the possibility of extreme danger. The legislature recognized that this exposure could cause a fireman to become the victim of tuberculosis, hypertension, or heart disease.
Id. at 440-41. Caldwell established that Florida courts generally applied the Thayer-Wigmore view to presumptions in civil cases, unless that presumption is clearly an “expression of social policy,” in which case the Morgan-McCormick view is applicable.[3]
In 1976, presumptions were codified into the Florida Evidence Code. See Ch. 76-237, § 1, Laws of Fla. Those statutes, which have remained essentially unchanged during the last thirty-five years, provide:
Section 90.301 Presumption defined; inferences.—
(1) For the purposes of this chapter, a presumption is an assumption of fact which the law makes from the existence of another fact or group of facts found or otherwise established.
(2) Except for presumptions that are conclusive under the law from which they arise, a presumption is rebuttable.
(3) Nothing in this chapter shall prevent the drawing of an inference that is appropriate.
(4) Sections 90.301-90.304 are applicable only in civil actions or proceedings.
Section 90.302 Classification of re-buttable presumptions.—
Every rebuttable presumption is either:
(1) A presumption affecting the burden of producing evidence and requiring the trier of fact to assume the existence of the presumed fact, unless credible evidence sufficient to sustain a finding of the nonexistence of the presumed fact is introduced, in which event, the existence or nonexistence of the presumed fact shall be determined from the evidence without regard to the presumption; or
(2) A presumption affecting the burden of proof that imposes upon the party against whom it operates the burden of proof concerning the nonexistence of the presumed fact.
*54 Section 90.308 Presumption affecting the burden of producing evidence defined.—
In a civil action or proceeding, unless otherwise provided by statute, a presumption established primarily to facilitate the determination of the particular action in which the presumption is applied, rather than to implement public policy, is a presumption affecting the burden of producing evidence.
Section 90.304 Presumption affecting the burden of proof defined.—
In civil actions, all rebuttable presumptions which are not defined in section 90.303 are presumptions affecting the burden of proof.
§§ 90.301-.304, Fla. Stat. (2011).
The Florida Evidence Code essentially adopted the California approach to presumptions. Presumptions “established primarily to facilitate the determination of the particular action in which the presumption is applied” were governed by section 90.303 and followed the Thayer-Wigmore approach. Presumptions established to implement a particular public policy were governed by section 90.304 and followed the Morgan-McCormick view.
In Department of Agriculture & Consumer Services v. Bonanno, 568 So.2d 24 (Fla.1990), this Court articulated the difference between the two types of presumptions as defined by the Florida Evidence Code. With regard to section 90.303 presumptions, this Court stated that “[t]his type of presumption is commonly referred to as a vanishing presumption, or a ‘bursting bubble’ presumption. Once evidence rebutting the presumption is introduced, the presumption disappears and the jury is not told of it.” Id. at 31 (emphasis supplied). With regard to the presumption articulated in section 90.304, this Court stated:
When a presumption shifts the burden of proof, the presumption remains in effect even after evidence rebutting the presumption has been introduced and the jury must decide if the evidence is sufficient to overcome the presumption. Public Health Trust v. Valcin, 507 So.2d 596 (Fla.1987). Presumptions which shift the burden of proof in civil proceedings are primarily expressions of social policy. Id. at 601; Caldwell v. Division of Retirement, 372 So.2d 438, 440 (Fla.1979); C. Ehrhardt, Florida Evidence 68-79 (2d ed. 1984) (e.g., presumptions of the validity of marriage, sanity in civil cases, legitimacy of a child born in wedlock, the correctness of judgments).
Id. at 31-32 (emphasis supplied). Although not stated explicitly, in Bonanno this Court confirmed that section 90.303 was representative of the Thayer-Wig-more approach and section 90.304 of the Morgan-McCormick view, and that the Florida Evidence Code embraced California’s system of handling presumptions.

Sinkhole Law Backgrounds

In 1981, the Florida Legislature enacted section 627.706, which required “[e]very insurer authorized to transact property insurance in Florida [to] make available coverage for insurable sinkhole losses on any structure.” Ch. 81-280, § 2, Laws of Fla. In 1992, the Florida Legislature enacted section 627.707, which established minimum standards for claim investigations during the sinkhole claim process that must be satisfied before an insurer could reject a claim of loss. See ch. 92-146, § 1, Laws of Fla. That version of section 627.707, which addressed the claim process, provided:
(1) Upon receipt of a claim for a sinkhole loss, the insurer must make an inspection of the insured’s premises to determine if there has been physical *55 damage to the structure which might be the result of sinkhole activity.
(2) If, upon the investigation pursuant to subsection (1), the insurer discovers damage to a structure which is consistent with sinkhole activity or if the structure is located in close proximity to a structure in which sinkhole damage has been verified, then prior to denying a claim, the insurer must obtain a written certification from an individual qualified to determine the existence of sinkhole activity, stating that the cause of the claim is not sinkhole activity, and that the analysis conducted was of sufficient scope to eliminate sinkhole activity as the cause of damage within a reasonable professional probability. The written certification must also specify the professional discipline and professional licensure or registration under which the analysis was conducted. Effective July 1,1993, this section is repealed.
Section 2 of chapter 92-146 also provided:
From the effective date of this act and through July 1, 1993, no insurer shall nonrenew any policy of property insurance on the basis of filing of claims for partial loss caused by sinkhole damage or clay shrinkage as long as the total of such payments does not exceed the current policy limits of coverage for property damage, and provided the insured has repaired the structure in accordance with the engineering recommendations upon which any payment or policy proceeds was based.
Finally, section 3 of chapter 92-146 mandated a study to examine “the issue of insurance coverage of sinkholes in the state.” Section 627.707(2) became effective on April 8, 1992, and the sunset provision of that statute provided for its repeal
on July 1, 1993. See § 627.707, Fla. Stat. (Supp.1992).
The sunset provision, however, never became effective. In June 1993, the Legislature enacted chapter 93-401, Laws of Florida.[4] Section 4 of chapter 93-401 amended section 627.707 in three significant ways: the law (1) removed the sunset provision of 627.707(2); (2) added a provision that allowed an insurer to collect from the policyholder up to 50 percent, up to $2,500, of the cost of the analysis required by that statute for claims “without good faith grounds”; and (3) precluded an insurer from not renewing a policy “on the basis of filing of claims for partial loss caused by sinkhole damage or clay shrinkage as long as the total of such payments does not exceed the current policy limits of coverage for property damage.” The new version became effective on June 8, 1993, did not contain a sunset provision, and remained unchanged until 2005.
In 2005, the Legislature significantly restructured the sinkhole claim process. Chapter 2005-111, Laws of Florida, amended sections 627.706 and 627.707, Florida Statutes (2005), and enacted sections 627.7065, 627.7072, and 627.7073, Florida Statutes (2005). Chapter 2005-111 basically reformed the claim process and the requirements for the investigation and reporting of claims for sinkhole damage that an insurer was required to satisfy before denying a claim of loss. Section 627.707, Florida Statutes, was amended, in part, to comply with the newly enacted sections 627.7072 and 627.7073. See ch. 2005-111, § 19, Laws of Fla. The former articulated testing standards for the claim process in connection with sinkhole claims and provided:
(1) The engineer and professional geologist shall perform such tests as *56 sufficient, in their professional opinion, to determine the presence or absence of sinkhole loss or other cause of damage within reasonable professional probability and for the engineer to make recommendations regarding necessary building stabilization, and foundation repair.
(2) Testing by a professional geologist shall be conducted in compliance with the Florida Geological Survey Special Publication No. 57 (2005).
Ch.2005-111, § 20, Laws of Fla. Section 627.7073, the statute at the heart of this case, was enacted to govern the reports required during the claim process stemming from the tests required pursuant to section 627.7072. That statute provided:
(1) Upon completion of testing as provided in s. 627.7072, the engineer and professional geologist shall issue a report and certification to the insurer and the policyholder as provided in this section.
(a) Sinkhole loss is verified if, based upon tests performed in accordance with section 627.7072, an engineer and a professional geologist issue a written report and certification stating:
1. That the cause of the actual physical and structural damage is sinkhole activity within a reasonable professional probability.
2. That the analyses conducted were of sufficient scope to identify sinkhole activity as the cause of damage within a reasonable professional probability.
3. A description of the tests performed.
4. A recommendation by the engineer of methods for stabilizing the land and building and for making repairs to the foundation.
(b) If sinkhole activity is eliminated as the cause of damage to the structure, the engineer and professional geologist shall issue a written report and certification to the policyholder and'the insurer stating:
1. That the cause of the damage is not sinkhole activity within a reasonable professional probability.
2. That the analyses and tests conducted were of sufficient scope to eliminate sinkhole activity as the cause of damage within a reasonable professional probability.
3. A statement of the cause of the damage within a reasonable professional probability.
4. A description of the tests performed.
(c)The respective findings, opinions, and recommendations of the engineer and professional geologist as to the verification or elimination of a sinkhole loss and the findings, opinions, and recommendations of the engineer as to land and building stabilization and foundation repair shall be presumed correct.
Ch.2005-111, § 21, Laws of Fla. The presumption created during the claim process which is articulated in section 627.7073(l)(c) is the presumption in question in this ease.
Section 627.706 was amended to include definitions for “sinkhole,” “sinkhole loss,” “sinkhole activity,” “engineer,” and “professional geologist.” Ch.2005-111, § 17, Laws of Fla. Finally, the Legislature enacted section 627.7065 to create a “database of information relating to sinkholes.” Ch.2005-111, § 18, Laws of Fla. Subsection (1) of that provision provides:
The Legislature finds that there has been a dramatic increase in the number of sinkholes and insurance claims for sinkhole damage in the state during the past 10 years. Accordingly, the Legislature recognizes the need to track current and past sinkhole activity and to make the information available for pre *57 vention and remediation activities. The Legislature further finds that the Florida Geological Survey of the Department of Environmental Protection has created a partial database of some sinkholes identified in Florida, although the database is not reflective of all sinkholes or insurance claims for sinkhole damage. The Legislature determines that creating a complete electronic database of sinkhole activity serves an important purpose in protecting the public and in studying property claims activities in the insurance industry.
Ch.2005-111, § 18, Laws of Fla.
ANALYSIS
The question of whether the presumption articulated in section 90.304 of the Florida Evidence Code applies to the presumption created in section 627.7073(1)(c) of the claims process statute involves the application of a provision of the Florida Evidence Code and is a pure question of law that is reviewed de novo. See Kelley v. State, 3 So.3d 970, 973 (Fla.2009); see also Hernandez v. Paris Indus. Maintenance, 39 So.3d 466, 469 (Fla. 1st DCA 2010) (citing King v. Auto Supply of Jupiter, Inc. 917 So.2d 1015, 1018 (Fla. 1st DCA 2006)) (holding that an interpretation of the evidence code requires de novo review).

Application of Chapter 627 to the Litigation Context

Preliminarily, we note that nothing in the sinkhole claim process statutory scheme, as it appeared in 2005, applies that scheme in the litigation context. The sinkhole statutes appear in chapter 627, titled “Insurance Rates and Contracts,” specifically in Part X, titled “Property Insurance Contracts.” That chapter was designed to provide a framework for insurance companies to follow when encountering specific types of claims, in this case claims involving sinkhole damage. The application of a specific provision within that scheme to the evidentiary context is both misguided and inappropriate.
Nothing in section 627.7073, the statute in question here, justifies application of that statute to the litigation context. That section governs the claims process and the sinkhole reports that must be obtained by insurers and filed by the professional engineer or geologist employed by the insurer during the claim adjustment process to test for sinkhole damage. Section 627.7073(2), which immediately follows section 627.7073(l)(c), provides:
Any insurer that has paid a claim for a sinkhole loss shall file a copy of the report and certification, prepared pursuant to subsection (1), with the county property appraiser, who shall record the report and certification with the parcel number. The insurer shall bear the cost of filing and recording the report and certification. There shall be no cause of action or liability against an insurer for compliance with this section. The seller of real property upon which a sinkhole claim has been made shall disclose to the buyer of such property that a claim has been paid and whether or not the full amount of the proceeds were used to repair the sinkhole damage.
§ 627.7073(2), Fla. Stat. (2006). The only mention of a “cause of action” in section 627.7073 is in the context of what does not constitute a cause of action. See § 627.7073(2). If anything, the presumption of correctness attached to the report appears to be aimed at shielding the engineer or professional geologist from liability for title defects and the insurance companies from claims of improper denials of claims. Accordingly, because the sinkhole statutes do not apply to the litigation context, the trial court’s application of section *58 90.304 to section 627.7073(l)(c) and the treatment of this statute as evidentiary in nature in this case was incorrect. On this basis alone, we reverse and remand for further proceedings consistent with the decision we reach here today. The presumption applies to the initial claim process and investigation that insurance companies are required to follow in accepting or denying claims.

Plain Language of Section 627.7073(1) (c)

Even if this Court were to hold that section 627.7073(l)(c) is applicable in the context of other litigation, the plain language of the statute precludes the application of section 90.304 to the presumption created in section 627.7073(l)(c), which provides:
The respective findings, opinions, and recommendations of the engineer and professional geologist as to the verification or elimination of a sinkhole loss and the findings, opinions, and recommendations of the engineer as to land and building stabilization and foundation repair shall be presumed correct.
This language follows sections of legislation that establish the requirement that such a report be obtained as a condition precedent to a denial of benefits. Nothing in the plain language of section 627.7073(l)(c), or any other language in any section, indicates the type of presumption, and, therefore, which evidentiary statute is applicable here. The application of a presumption as alleged and argued by Universal at trial, that an insured could not overcome this presumption, would render any portion of section 627.7073 unconstitutional and inconsistent with all other provisions of the sinkhole statutes. See Recchi Am. Inc. v. Hall, 692 So.2d 153, 154 (Fla.1997) (articulating the test for determining the constitutionality of a conclusive presumption).
In the absence of clear statutory language to the contrary, statutory presumptions are governed by section 90.303. This principle is supported by the rule articulated in Nationwide and adopted by this Court in Caldwell that Florida generally follows the Thayerian rule. See Caldwell, 372 So.2d at 440 (citing Nationwide, 222 So.2d at 756). Caldwell also established that the only instances in which the Morgan-McCormick presumptions, i.e., those that affect the burden of proof, are utilized are those that involve clear expressions of social policy, such as protecting police and firefighters. See id. (citing 5 Charles W. Ehrhardt, West’s Florida Practice: Florida Evidence § 303.1 (1977); 1 Kenneth B. Hughes, Florida Evidence Manual § 57 (1975)). Accordingly, in the absence of express language in the statute, a clear intent to advance a particular social policy, or a specific reference to a different approach, the Thayer-Wigmore rule, codified under Florida law section 90.303, governs in Florida.
This holding is supported by the notion that expressions of clear social policy are explicitly stated. Specifically, when the Legislature intends that section 90.304 apply to a statutory presumption, it knows how to articulate that intent. See e.g., § 733.107(2), Fla. Stat. (2010) (“The presumption of undue influence implements public policy against abuse of fiduciary or confidential relationships and is therefore a presumption shifting the burden of proof under sections 90.301-90.30Jp.” (emphasis supplied)); § 742.12(4), Fla. Stat. (2010) (“A statistical probability of paternity of 95 percent or more creates a rebutta-ble presumption, as defined by section 90.301p, that the alleged father is the biological father of the child.” (emphasis supplied)); § 742.10(1), Fla. Stat. (2010) (“If an adjudicatory proceeding was not held, a notarized voluntary acknowledgment of paternity or voluntary acknowledgment of *59 paternity, which is witnessed by two individuals and signed under penalty of perjury as specified by section 92.525(2), creates a rebuttable presumption, as defined by section 90.304-.... ” (emphasis supplied)); § 409.256(10)(d), Fla. Stat. (2010) (“For purposes of this section, a statistical probability of paternity that equals or exceeds 99 percent creates a presumption, as defined in section 90.304, that the putative father is the biological father of the child.” (emphasis supplied)).
Generally, when Florida courts have held that the Legislature “intended” to incorporate section 90.304 into a statutory presumption, the statute in question explicitly provides for such an application. See Hack v. Janes, 878 So.2d 440, 448 (Fla. 5th DCA 2004) (citing § 733.107(2), Fla. Stat. (2002)); Ferguson v. Williams, 566 So.2d 9, 11 (Fla. 3d DCA 1990) (citing § 742.12, Fla. Stat. (1989)); Jones v. Crawford, 552 So.2d 926, 927-28 (Fla. 1st DCA 1989) (citing § 742.12(1), Fla. Stat. (1987)).
Florida courts have applied section 90.304 to a statutory presumption, absent explicit language in the statute, in the interpretation of only three statutes: section 658.56(2), Florida Statutes (1987), (which has since been repealed), section 61.075(5)(a)5, Florida Statutes (1997), and section 112.533, Florida Statutes (Supp. 1990). In In re Estate of Combee, 583 So.2d 708 (Fla. 2d DCA 1991), approved, 601 So.2d 1165 (Fla.1992), the Second District addressed section 658.56, Florida Statutes (1987), which provided:
(1) Unless otherwise expressly provided in the signature contract card or other similar instrument delivered to and accepted by a bank in connection with the opening or maintenance of an account, including a certificate of deposit, in the names of two or more persons, whether minor or adult, payable to or on the order of one or more of them or the surviving account holder or holders, all such persons and each person depositing funds in any such account shall be presumed to have intended that upon the death of any such person all rights, title, interest, and claim in, to, and in respect of such deposits and account and the additions thereto, and the obligation of the bank created thereby, less all proper setoffs and charges in favor of the bank, shall vest in the surviving holder or holders.
(2) The presumption herein created may be overcome only by proof of fraud or undue influence or clear and convincing proof of a contrary intent.
Id. § 658.56(1)-(2), repealed by Laws of Fla.1992 ch. 92-303, § 189. The Second District held that “[t]he banking statute ... creates a presumption which shifts the burden of proof to the estate under section 90.304, Florida Statutes (1987), and increases the burden to the clear and convincing standard.” Combee, 583 So.2d at 711 (citing Slomowitz v. Walker, 429 So.2d 797 (Fla. 4th DCA 1983)). Although the Second District in that case did not conduct an analysis with regard to whether section 90.303 or section 90.304 governed the presumption in question, it is clear on the face of the statute involved there that the Legislature intended section 90.304 to apply. The Legislature explicitly stated in that statute that the presumption did not disappear in light of evidence to the contrary, instead requiring “clear and convincing proof of a contrary intent.” § 658.56(2), Fla. Stat. (1987) repealed by Laws of Fla. 1992 ch. 92-303, § 189. Accordingly, section 90.303, which requires the presumption to disappear if sufficient evidence to the contrary is presented, would contradict the “clear and convincing” standard employed in section 658.56. It must also be noted that the language employed in section 658.56(2) was enacted in 1971, prior to *60 the enactment of the Florida Evidence Code in 1976. See ch. 71-205, § 1, Laws of Fla. Further, the stability of the banking industry and accounts were involved.
The facts presently before the Court are clearly distinguishable from Combee for two distinct reasons. First, unlike the statute in Combee, the application of section 90.303 to section 627.7073(l)(c) does not contradict the plain language of the statute. Second, the presumption articulated in section 627.7073(l)(c) was enacted in 2005, long after the enactment of the Florida Evidence Code. The Legislature had the opportunity to include language requiring the application of section 90.304, had it intended for this evidentiary section to apply. Accordingly, Combee is clearly distinguishable from the facts presently before the Court and not controlling here.
Another instance of a Florida court applying section 90.304 to a statutory presumption absent explicit language in the statute occurred with regard to the interpretation of section 61.075(5)(a)5, Florida Statutes (1997). In Heim v. Heim, 712 So.2d 1238, 1239 (Fla. 4th DCA 1998), the Fourth District held that section 90.304 governs the presumption articulated in that statute. Section 61.075(5)(a)5 provided:
All real property held by the parties as tenants by the entireties, whether acquired prior to or during the marriage, shall be presumed to be a marital asset. If, in any case, a party makes a claim to the contrary, the burden of proof shall be on the party asserting the claim for a special equity.
In that statute, although the Legislature did not explicitly indicate that section 90.304 applies, it stated that any party that makes a claim to the contrary bears the “burden of proof.” Here, the Legislature did not expressly provide a directive with regard to whether it intended the presumption to be one affecting the burden of producing evidence, and therefore governed by section 90.303, or one affecting the burden of proof, governed by section 90.304.
The final instance of a Florida Court applying section 90.304 to a statutory presumption absent explicit language in the statute occurred with regard to the interpretation of section 112.533, Florida Statutes (Supp.1990). In City of Delray Beach v. Barfield, 579 So.2d 315, 317 (Fla. 4th DCA 1991), the Fourth District interpreted section 112.533(2)(b), governing complaints against a law enforcement officer, which provided:
The text of this statutory presumption is: For the purposes of this subsection, an investigation shall be considered active as long as it is continuing with a reasonable, good faith anticipation that an administrative finding will be made in the foreseeable future. An investigation shall be 'presumed to be inactive if no finding is made within ⅛5 days after the complaint is. filed.
§ 112.533(2)(b), Fla. Stat. (Supp.1990) (emphasis supplied.) Judge Farmer, writing for the majority, stated:
We entirely agree with appellee’s argument that the 45-day presumption is of the kind covered by section 90.304, Fla. Stat. (1989). Such presumptions in Florida are not bursting bubbles. They are more properly likened to helium-filled balloons which keep the fact aloft until weightier evidence brings it down. Insurance Company of the State of Pennsylvania v. Estate of Guzman, 421 So.2d 597, 601 (Fla. 4th DCA 1982).
Barfield, 579 So.2d at 318. The Fourth District, however, failed to provide any rationale or reasoning to support its conclusion that section 90.304 was applicable to section 112.533(2)(b). In light of the fact that this decision stands alone in its *61 application of section 90.304 to a statutory presumption absent any language in the underlying statute supporting such an application, we conclude that Barfield is not persuasive.
Universal’s reliance on Caldwell and City of Coral Gables v. Brasher, 132 So.2d 442 (Fla. 3d DCA 1961), is misguided. Universal relies on these cases to support the proposition that Florida courts have applied section 90.304 to a statutory presumption absent any indication that the Legislature intended for that evidentiary provision to apply. Both of those decisions, however, interpret statutes that were in effect before the Florida Evidence Code was enacted. See Caldwell, 372 So.2d at 439 (interpreting section 112.18(1), Florida Statutes (1975)); Brasher, 132 So.2d at 443 (interpreting section 185.34, Florida Statutes (1957)). As discussed above, prior to the enactment of the Florida Evidence Code, the procedural effect given to presumptions in Florida was defined exclusively by a common law approach. See Ins. Co. of State of Pa. v. Estate of Guzman, 421 So.2d 597, 601 (Fla. 4th DCA 1982). For section 627.7073(l)(c), Florida Statutes (2005), the statute at issue, the Legislature certainly knew how to create a burden shifting presumption pursuant to section 90.304, but chose not to do so.
Finally, it should be noted that this Court has applied section 90.304 to judicially created presumptions under very limited factual circumstances. For example, in Beal Bank, SSB v. Almand & Associates, 780 So.2d 45 (Fla.2001), this Court stated:
Accordingly, we hold that as between the debtor and a third-party creditor (other than the financial institution into which the deposits have been made), if the signature card of the account does not expressly disclaim the tenancy by the entireties form of ownership, a presumption arises that a bank account titled in the names of both spouses is held as a tenancy by the entireties as long as the account is established by husband and wife in accordance with the unities of possession, interest, title, and time and with right of survivorship. The presumption we adopt is a presumption affecting the burden of proof pursuant to section 90.304, Florida Statutes (2000), thus shifting the burden to the creditor to prove by a preponderance of evidence that a tenancy by the entireties was not created. See generally Public Health Trust v. Valcin, 507 So.2d 596, 600 (Fla.1987); Caldwell v. Division of Retirement, 372 So.2d 438, 440 (Fla.1979).
Id. at 58-59 (footnotes omitted). Beal did not involve the interpretation of a statutorily created presumption; rather, it involved the interpretation in a common law approach in banking relationships that would impact the stability of the banking industry and accounts. The application of section 90.304 to a presumption in banking relationships is not applicable here.
Even if we were to find the principle of law articulated in Beal to be persuasive, which we do not, that case is distinguishable on other grounds. Earlier in the Beal decision, the Court noted:
Although we understand the considerations that originally led to this Court’s decision not to adopt a presumption of a tenancy by the entireties in personal property similar to that in real property, we conclude that stronger policy considerations favor allowing the presumption in favor of a tenancy by the entireties when a married couple jointly owns personal property.
780 So.2d at 57 (emphasis supplied). The Court noted that the presumption in banking relationships in question was an ex *62 pression of social policy, and therefore should affect the burden of proof.

Legislative History of Section 627.7073(l)(c)

Universal asserts that section 627.7073(l)(c) is an expression of social policy and should therefore be governed by section 90.304. Specifically, Universal asserts that applying section 90.304 to the sinkhole statutes furthers two policy goals: (1) the reduction of the number of disputed sinkhole claims in Florida; and (2) the reduction of the overall costs associated with sinkhole losses in Florida. To support this contention, Universal relies on the following excerpt from section 627.7065, Florida Statutes (2005):
The Legislature finds that there has been a dramatic increase in the number of sinkholes and insurance claims for sinkhole damage in the state during the past 10 years. Accordingly, the Legislature recognizes the need to track current and past sinkhole activity and to make the information available for prevention and remediation activities. The Legislature further finds that the Florida Geological Survey of the Department of Environmental Protection has created a partial database of some sinkholes identified in Florida, although the database is not reflective of all sinkholes or insurance claims for sinkhole damage. The Legislature determines that creating a complete electronic database of sinkhole activity serves an important purpose in protecting the public and in studying property claims activities in the insurance industry.
(Emphasis supplied.)
Preliminarily, the two “policies” that Universal alleges are advanced by section 627.7073 do not even appear to be “social policies.” At best, section 627.7065 indicates the need for research so that a social policy can be formed and the public protected. Accordingly, because the goals or policies asserted by Universal are not advanced or included in the sinkhole statutes, and the legislation is specifically designed to protect the public during the claims process, we find this argument to be without merit.
Even if the sinkhole statutes did advance social policies, they do not warrant the application of section 90.304. In Insurance Co. of State of Pennsylvania v. Estate of Guzman, 421 So.2d 597 (Fla. 4th DCA 1982), the Fourth District stated that “presumptions affecting the burden of proof declare or implement some strong social policy of the state, like the validity of a marriage, or the legitimacy of a child.” Id. at 602 (emphasis supplied) (footnote omitted). The two cases relied on by Universal, Caldwell and Brasher, involved far stronger social policies. In Caldwell, this Court noted that the application of a burden-shifting scheme that provided a presumption in favor of firefighters
embodies the social policy of the state which recognizes that firemen are subjected during their career to the hazards of smoke, heat, and nauseous fumes from all kinds of toxic chemicals as well as extreme anxiety derived from the necessity of being constantly faced with the possibility of extreme danger. The Legislature recognized that this exposure could cause a fireman to become the victim of tuberculosis, hypertension, or heart disease.
372 So.2d at 440-41 (emphasis supplied). Although not explicitly stated in Brasher, the social policy advanced was also clear:
Any condition or impairment of health of any - and all police officers employed in the state caused by tuberculosis, hypertension, heart disease or hardening of the arteries, resulting in total or partial disability shall be presumed to have *63 been suffered in line of duty unless the contrary be shown by competent evidence, provided, however, that such police officer shall have successfully passed a physical examination on entering into such service which examination fails to reveal any evidence of such condition.
132 So.2d at 443 n. 2 (quoting § 185.34, Fla. Stat. (1957)).
Lastly, a review of the bill that enacted the statute (chapter 2005-111) and the staff analyses associated with that bill reveal that nothing in any of those documents indicates that the presumption articulated in section 627.7073(l)(e) is an expression of any social policy, let alone one that favors insurance companies. If at all, the statutory plan is designed to require that insurance companies have expert reports in the claims process before denying a request for benefits. Although the Legislature frequently includes a “findings and purpose” section at the beginning of a statute, it did not do so here. See, e.g., ch. 93-401, § 1, Laws of Fla. Indeed, the Legislature did not provide such language in the bill, the statute, or even the staff analyses associated with the bill.

Section 90.106

The application of section 90.304 to section 627.7073(l)(c), as articulated at trial, was also inconsistent with section 90.106 Florida Statutes (2005), which provides that “[a] judge may not sum up the evidence or comment to the jury upon the weight of the evidence, the credibility of the witnesses, or the guilt of the accused.” If a trial court was permitted to instruct the jury that a particular document must be presumed correct, such an instruction would be in clear violation of the prohibition against such instructions articulated in section 90.106.

Preservation

Finally, Universal claims that the arguments advanced by Warfel are not preserved for appellate review. These claims by Universal are without merit. First, Universal contends that the record is insufficient to support Warfel’s assertions that he carried his statutorily mandated burden of proving that a loss occurred, that the loss occurred within the policy period, and that prompt notice of the loss was provided to the insurer. Universal asserts that “the jury could easily have found that Warfel failed to meet his burden to prove that a loss occurred during the policy period or that prompt notice was given. Any of those findings would have resulted in a verdict for Universal.” Universal also asserts that because the record was insufficient, the Second District should not have reached the jury instruction. To support this contention, Universal relies on Silver Star Citizens’ Committee v. City Council of Orlando, 194 So.2d 681, 682 (Fla. 4th DCA 1967), specifically this quotation: “We are governed, not by what might be shown, but what is in fact shown by the record now before this court.” Universal construes this statement to support the “rule” that district courts cannot reach the merits of one legal question before performing a sufficiency of the evidence analysis for another. This argument is not supported by Silver Star. The statement relied on by Universal was taken grossly out of context. The full paragraph from which that statement was taken provides:
No amendments were filed, and we have no idea, of course, what might have been shown had amendments been filed. We are governed, not by what might be shown, but what is in fact shown by the record now before this court.
Id. Earlier in the opinion, the Fourth District in Silver Star noted that “[t]he peti *64 tion presented to the circuit court does not identify either petitioner as having been affected, directly or indirectly, by the acts concerning which complaint is made.” Id. Here, unlike in Silver Star, the underlying complaint alleges all three of the statutory obligations Universal claims that Warfel failed to establish. Universal fails to provide any authority that required the Second District to engage in the factual inquiry of sufficiency prior to answering the legal inquiry present in the certified question to this Court. Accordingly, we deny relief to Universal on this issue.
Next, Universal alleges that the Second District failed to consider whether the purported jury instruction error was fundamental. Jury instructions are subject to the contemporaneous objection rule, and absent an objection at trial, can be raised on appeal only if fundamental error occurred. See State v. Weaver, 957 So.2d 586, 588 (Fla.2007) (citing Reed v. State, 837 So.2d 366, 370 (Fla.2002)). Here, Warfel clearly objected to the law upon which the jury instruction was based and argued the proper rule of evidence. The jury was incorrectly instructed that the position of Universal was presumed to be correct.
The question of whether an objection was preserved for appellate review is clear. Under the test articulated in Castor v. State, 365 So.2d 701, 703 (Fla.1978), an objection must be specific enough “to apprise the trial judge of the putative error and to preserve the issue for intelligent review on appeal.” See also Aills v. Boemi, 29 So.3d 1105, 1109 (Fla.2010) (citing Castor); Williams v. State, 414 So.2d 509, 511 (Fla.1982) (citing Castor). Here, Universal filed a pretrial motion to establish the applicability of section 90.304 and War-fel filed a response and objected to that position. At a pretrial hearing, Warfel articulated his opposition to the application of section 90.304 to this case, and explicitly urged the court to adopt section 90.303. The trial judge ultimately ruled in favor of Universal with regard to the application of section 90.304. Warfel’s argument and memo clearly “apprise[d] the trial judge of the putative error” and allows for “preservation of] the issue for intelligent review on appeal.” Aills, 29 So.3d at 1109 (quoting Castor, 365 So.2d at 703). Accordingly, we hold that the objection was preserved pursuant to Castor.
Even if this Court were to determine that the argument was not preserved by proper objection, the erroneous instruction amounts to fundamental error. Fundamental error is one that “goes to the foundation of the case or goes to the merits of the cause of action.” See Jaimes v. State, 51 So.3d 445, 448 (Fla.2010) (quoting Sanford v. Rubin, 237 So.2d 134, 137 (Fla.1970)). “To justify not imposing the contemporaneous objection rule, ‘the error must reach down into the validity of the trial itself....’” Id. (quoting State v. Delva, 575 So.2d 643, 644-45 (Fla.1991)). This case satisfies the strict requirements of fundamental error. The instruction directing the jury to presume that Universal’s report was correct reached down to the validity of the trial itself, and thus is fundamental error. By ordering the jury to presume that Universal’s report was correct, the trial court removed a critical factual issue from the jury, i.e., whether a sinkhole caused the damage to Warfel’s property. This question is the crux of the entire case, and the trial court’s ordering the jury to presume the report correct was tantamount to a directed verdict.
Third, Universal asserts that the Second District erred by failing to consider whether the instruction was an incorrect statement of law. This is incorrect. The Second District stated: “Because the trial court misapplied the presumption at work *65 in this case and gave the jury an instruction improperly shifting the burden of proof, a new trial is required.” Warfel, 36 So.3d at 140 (emphasis supplied). Accordingly, we deny relief on this claim.
Finally, Universal’s assertion that the error was invited is without merit. Fundamental error is waived where defense counsel requests an erroneous instruction. See Armstrong v. State, 579 So.2d 734, 735 (Fla.1991) (citing Ray v. State, 403 So.2d 956 (Fla.1981)). Fundamental error is also waived where defense counsel affirmatively agrees to an improper instruction. See State v. Lucas, 645 So.2d 425, 427 (Fla.1994) (“The only exception we have recognized is where defense counsel affirmatively agreed to or requested the incomplete instruction.”) (citing Armstrong, 579 So.2d at 734); see also Tindall v. State, 997 So.2d 1260, 1261 (Fla. 5th DCA 2009); Jimenez v. State, 994 So.2d 1141, 1142-43 (Fla. 3d DCA 2008); York v. State, 932 So.2d 413, 416 n. 2 (Fla. 2d DCA 2006) (“An exception from the doctrine of fundamental error applies in circumstances ‘where defense counsel affirmatively agreed to or requested’ an erroneous instruction.”) (quoting Lucas, 645 So.2d at 427). Fundamental error is waived under the invited error doctrine because “a party may not make or invite error at trial and then take advantage of the error on appeal.” Sheffield v. Superior Ins. Co., 800 So.2d 197, 202 (Fla.2001) (quoting Goodwin v. State, 751 So.2d 537, 544 n. 8 (Fla.1999)).
Warfel did not invite the erroneous jury instruction. First, as indicated above, Warfel properly objected to the instruction pursuant to the Castor test. Second, Warfel never “affirmatively agreed” to the jury instruction. At best, Warfel was forced to deal with the jury instruction because he lost pretrial arguments with regard to which presumption statute applies. The jury instruction proposed by Warfel was:
Mr. Warfel has the burden of proof to establish by the greater weight of the evidence that he has sustained actual physical damage to his home during the time the home was insured by Universal Insurance Company of North America (Universal Insurance), which was caused, at least in part, by sinkhole activity.
The jury instruction actually given to the jury was:
You must presume that the opinions, findings, and conclusion in the SD II report as to the cause of damage and whether or not a sinkhole loss has occurred are correct. This presumption is rebuttable. The Plaintiff has the burden of proving by a preponderance of the evidence that the findings, opinions, and conclusions of the report are not correct.
Warfel, 36 So.3d at 138.
A concurrent reading of these two jury instructions leads to the obvious conclusion that Warfel did not invite the erroneous jury instruction.

Conclusion

For all the aforementioned reasons, we approve the decision of the Second District Court of Appeal and remand for further proceedings consistent with this decision.
It is so ordered.
LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
PARIENTE and POLSTON, JJ., concur in result.
CANADY, C.J., dissents.

. Warfel no longer challenges the retroactive application of the newly enacted statutes to his policy, so we need not address that issue here.

. The Caldwell Court actually provided the same quotation from Nationwide recited above. See 372 So.2d at 440 (citing Nationwide, 222 So.2d at 756).

. Although Caldwell was decided after the enactment of the Florida Evidence Code, this Court had reviewed the 1975 version of a statute, which was enacted one year before the Florida Evidence Code became effective. This fact is of some importance in the resolution of this case, and will be elaborated upon later in this opinion.

. Section 1 of that chapter imposed a moratorium on cancellation and nonrenewal of residential property coverages. See ch. 93-401, § 1(1), Laws of Fla.