NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

CITIZENS PROPERTY INSURANCE )
CORPORATION, )
           )
          Appellant, )
           )
v. )     Case No. 2D14-3712
           )
EDGARDO NUNEZ and LUCILA LOPEZ, )
           )
          Appellees. )
_____ )

Opinion filed June 24, 2016.

Appeal from the Circuit Court for
Hillsborough County; Christopher C. Nash,
Judge.

Kara Berard Rockenbach of Methe &
Rockenbach, P.A., West Palm Beach; and
Andrew P. Rock and Nyasha S. Seale of
The Rock Law Group, P.A., Maitland, for
Appellant.

Aaron S. Kling of Smith, Kling & Thompson,
P.A., Tampa, for Appellees.


LaROSE, Judge.

         Citizens Property Insurance Corporation (Citizens) appeals a final

judgment, entered after a jury verdict, in favor of Edgardo Nunez and Lucila Lopez (the

insureds). The insureds sued Citizens for breach of a homeowners insurance policy;

Citizens failed to pay benefits for a sinkhole claim. We have jurisdiction. Fla. R. App. P. 9.130(b)(1)(A). We affirm, in part, and reverse, in part.

Background—The Relevant Statutory Scheme

The insureds purchased an all-risk homeowners policy from Citizens. The policy insured against "sinkhole loss" through a separate sinkhole loss coverage endorsement. The insureds made a sinkhole claim during the policy period.

Florida's insurance statutes establish procedures to resolve sinkhole claims. See §§ 627.707-.7074, Fla. Stat. (2010). After the insured makes a claim, the insurer must inspect the insured's property to determine whether there is physical damage to the structure that may have resulted from sinkhole activity. § 627.707(1). If so, the insurer must engage a professional engineer or geologist who will determine the cause of loss within a reasonable professional probability; the professional must issue a written report. §§ 627.707(2)(a), .7073(1). The professional's report certifying sinkhole damage will include a description of the tests performed and a recommended method to stabilize and repair the property. § 627.7073(1)(a). The report is presumed correct. § 627.7073(1)(c). If the professional verifies a sinkhole loss, the insurer must pay to stabilize the property "in accordance with the recommendations of the professional engineer as provided under s. 627.7073, and in consultation with the policyholder." § 627.707(5)(a). The insurer may withhold payment for subsurface repairs "until the policyholder enters into a contract for the performance of building stabilization or foundation repairs." § 627.707(5)(b).

If the policyholder does not accept the repair recommendations of the insurer's professional, section 627.7074 provides an alternative method to resolve the disputed claim: neutral evaluation that is mandatory if either party requests it. See

§ 627.7074(4). The neutral evaluator prepares a report detailing his or her findings of the need for repair and estimated costs to stabilize the property. § 627.7074(12). These recommendations are nonbinding. § 627.7074(13). The insurer and the insured retain their rights to seek redress in the court. Id. If the insurer agrees to comply with the neutral evaluator's recommendation, but the policyholder refuses, the insurer is not liable for attorney's fees under section 627.428 or other statutory provisions "unless the [insured] obtains a judgment that is more favorable than the recommendation of the neutral evaluator." § 627.7074(15).

This Case—The Relevant Facts

Citizens inspected the insureds' home and determined that the physical damage may have resulted from sinkhole activity. Citizens hired Geohazards, an engineering firm, to verify a sinkhole loss. Geohazards certified sinkhole damage and recommended compaction grouting to stabilize the home and to repair the foundation. Citizens informed the insureds of Geohazards' determination and recommendation. See § 627.707(3).

Citizens paid to repair the above-ground damage to the home. It withheld payment for subsurface repairs until the insureds contracted with a third party to

perform that work, as required by the insurance policy[1] and section 627.707(5)(b).[2]

Citizens advised the insureds that it was prepared to pay $10,946.20 for the subsurface repairs. This amount, obviously, was an error; it appears to be undisputed that Geohazards estimated the cost to be between $61,360 and $77,360.

Not satisfied with Citizens' approach, the insureds hired their own engineering firm, Florida Testing and Environmental (FTE). FTE recommended more extensive compaction grouting and underpinning. FTE estimated a total cost of

---

[1]The policy provided, in pertinent part, as follows:
CONDITIONS
In Forms CIT DP-1 and CIT DP-3:
Loss Settlement paragraph 5.d. is added as follows:
d. In event of "sinkhole loss":

    . . . .

(2)    We will pay no more than the actual cash value of the damaged property, not including underpinning or grouting or any other repair technique performed below the existing foundation of the building, until you enter into a contract for the performance of building stabilization or foundation repairs.

(3)    Once you enter into such contract, we will pay the amounts necessary to begin and perform such repairs as the work is performed and as the expenses are incurred.

(4)    We may at our option and with your written approval and written approval of any lienholder, make payment directly to the persons selected by you to perform the land and building stabilization and foundation repairs.

[2]Section 627.707(5)(b) provides:
The insurer may limit its total claims payment to the actual cash value of the sinkhole loss, which does not include underpinning or grouting or any other repair technique performed below the existing foundation of the building, until the policyholder enters into a contract for the performance of building stabilization or foundation repairs in accordance with the recommendations set forth in the insurer's report issued pursuant to s. 627.7073.

- 4 -

$129,070–$31,750 of which would be for underpinning. The insureds contracted with Green Earth Group to make the subsurface repairs. Apparently, the insureds did not submit the contract to Citizens prior to filing suit. Although Citizens never denied coverage, it held fast to Geohazards' repair recommendation. Consequently, the parties reached an impasse as to the scope and cost of subsurface repairs.

After the insureds sued Citizens, Citizens invoked the neutral evaluation process of section 627.7074. The neutral evaluator concluded that compaction grouting was the appropriate method of repair. He estimated the cost at $79,920, a little higher than Geohazards' earlier high mark for grouting. The insureds disagreed with the neutral evaluator's opinion and continued with the lawsuit.

At trial, an FTE engineer testified for the insureds that the proper subsurface repair required underpinning, at a cost of $31,750, plus compaction grouting. The neutral evaluator also testified, confirming his earlier conclusion that compaction grouting was sufficient. Citizens solicited the testimony of other engineers who agreed that compaction grouting, without underpinning, was the proper repair method for the subsurface damage. Our careful review of the record reveals some testimony that underpinning might be harmful to the home. Suffice it to say that the jury heard conflicting testimony on how best to fix the problem.

Citizens moved for a directed verdict, arguing that it did not breach the insurance contract. Citizens posited that it owed nothing for subsurface repairs because the insureds, prior to filing suit, did not provide to Citizens an executed contract with an authorized contractor to perform the subsurface work. The insureds countered that the presumption of correctness attached to the insurer's engineer's

recommendation vanished when the insureds presented conflicting evidence as to the proper method and cost of repair. See Universal Ins. Co. v. Warfel, 82 So. 3d 47, 58 (Fla. 2012). They also contended that the requirement of a repair contract before payment is made does not bar a breach-of-contract suit when the parties dispute the method of repair. The trial court denied the motion for a directed verdict.

Over Citizens' objections, the trial court instructed the jury that it could award damages to the insureds for subsurface repair without addressing the need for a repair contract to trigger Citizens' payment obligation. The trial court instructed the jury on the burden of proof as follows:

> [The insureds] have the burden of proof to establish, by the greater weight of the evidence, that [Citizens'] repair recommendations were insufficient to satisfy [Citizens'] obligations to stabilize the land, stabilize the building, and repair the foundation . . . .

The verdict form asked the jury the following questions regarding subsurface repairs:[3]

> 1. Did Citizens' subsurface repair recommendation meet its obligations under Florida law and the subject policy to stabilize the land, stabilize the building and repair the foundation?
>
> 2. What is the total cost in dollars necessary to properly stabilize the land, stabilize the building and repair the foundation?

The jury returned a verdict in favor of the insureds regarding subsurface damages. They answered "no" to question 1 and awarded $100,000 for subsurface

---

[3]The verdict form also contained a question regarding above-ground damage. However, because the jury returned a verdict for Citizens on those damages, it is not a subject of this appeal.

repair damages. The trial court entered a final judgment that included $19,683.64 for prejudgment interest from the date of loss.

Citizens filed a motion to set aside the verdict and to enforce the statutory requirement that the insureds enter into a repair contract before payment is due. The trial court denied the motion. This appeal follows.

## Analysis

### Presuit Contract Requirement

Citizens argues that it had no obligation to pay for subsurface repairs because the insureds failed to provide an acceptable repair contract before they filed suit. We rejected a similar argument in Roker v. Tower Hill Preferred Insurance Co., 164 So. 3d 690 (Fla. 2d DCA 2015). In Roker, Tower Hill's engineer recommended a subsurface repair consisting of compaction and chemical grouting. Id. at 691. Tower Hill told Roker that she must enter into a repair contract consistent with the engineer's recommendations before Tower Hill would pay the sinkhole claim. Id. Roker sought a second opinion from a different engineer. As in our case, that engineer recommended underpinning and grouting. Id. at 692. Roker contracted with a third party to make the repairs. Id. Tower Hill rejected the contract and requested neutral evaluation. Id. The neutral evaluator agreed with Tower Hill's engineer that underpinning was unnecessary. Id.

Still dissatisfied, Roker sued Tower Hill for breach of contract. Id. As with Citizens here, Tower Hill denied breaching the insurance contract, arguing that Florida law and the policy required Roker to enter into a repair contract in accordance with Tower Hill's repair recommendations before payments were due. Id. The trial court agreed and granted Tower Hill a summary judgment. Id. We reversed, observing that

- 7 -

neutral evaluation is nonbinding and, importantly, that "the parties retain access to court." Id. at 693 (quoting § 627.7074(13)).

> [T]he legislature clearly intended and understood that some sinkhole disputes would still need to be resolved by juries. We cannot conceive of any scenario in which the insured could obtain a judgment more favorable than the neutral evaluator's recommendation if the insured were not able to challenge the method of repair in court before a jury.

Id.

We added that, in the litigation context, the insurer is not entitled to rely on section 627.7073(c)'s presumption that the insurer's engineer's recommendation is correct when the insured provides evidence challenging the insurer's proposed repair method. Roker, 164 So. 3d at 694 (citing Warfel, 82 So. 3d at 57-59). Accordingly, Roker was entitled to a jury determination of the proper method of repair without entering into a contract acceptable to Tower Hill. See id. at 694. Roker compels the same conclusion here. Citizens' effort to distinguish Roker, by observing that there the insured presented a repair contract prior to suit, rings hollow.

Postsuit Contract Requirement

In its posttrial motion, Citizens argued that it had no obligation to pay the damages awarded by the jury until the insureds contracted with a third party to perform the subsurface repairs. The trial court denied the motion. Citizens informs us that the contract requirement applies, even postverdict, in order to promote the legislature's concern that sinkhole damage be repaired. See ch. 2011-39, § 21, at 570, Laws of Fla.;[4] Fla. S. Comm. on Banking & Ins., Issues Relating to Sinkhole Insurance 29

---

[4]"[M]any properties remain unrepaired even after loss payments, which reduces the local property tax base and adversely affects the real estate market. Therefore, the Legislature finds that losses associated with sinkhole claims adversely

(2010), http://www.flsenate.gov/UserContent/Session/2011/Publications/InterimReports/pdf/2011-104bi.pdf.[5]

Recently, in <u>Citizens Property Insurance Corp. v. Amat</u>, 41 Fla. L. Weekly D448, D450 (Fla. 2d DCA Feb. 19, 2016), we held that, although Citizens denied coverage, it could still insist that the policyholder enter into a postjudgment contract for subsurface repairs before it was obligated to pay the claim.  <u>See also</u> <u>Citizens Prop. Ins. Corp. v. Blaha</u>, 41 Fla. L. Weekly D885, D887 (Fla. 2d DCA Apr. 8, 2016); <u>Tower Hill Select Ins. Co. v. McKee</u>, 151 So. 3d 2, 4 (Fla. 2d DCA 2014).  Our holding in <u>Amat</u> gave continued voice to the legislature's intent that insurance payments for sinkhole claims be used to repair the damaged property.  Citizens' case, here, is more compelling.  Unlike <u>Amat</u>, Citizens did not deny coverage; the parties had a legitimate dispute about how to effect the subsurface repairs.  Accordingly, we reverse that portion of the final judgment that requires Citizens to pay for subsurface repairs before the insureds contracted to make those repairs.

---

affect the public health, safety, and welfare of this state and its citizens."  Ch. 2011-39, § 21, at 570, Laws of Fla.

      [5]    The state has a public policy interest in ensuring that policyholders, who have legitimate sinkhole losses, use insurance proceeds to repair their homes and stabilize their properties.  The failure of one policyholder to remediate sinkhole conditions underlying his or her property can subsequently affect their neighbors who may also experience sinkhole loss as the soils underlying the neighbor's property begin to ravel downward.

<u>Issues Relating to Sinkhole Insurance</u>, <u>supra</u>.

## Damages Amount

Citizens wants a new trial, arguing that the $100,000 jury verdict for subsurface repairs was against the manifest weight of the evidence. Citizens stresses the point that the jury award matched neither party's repair estimate. Citizens argues further that we should order a new trial because it is impossible to determine what repair method the jury approved. We disagree.

The highest estimate in evidence for compaction grouting was $84,500. The $100,000 verdict reasonably indicates that the jury determined that the proper repair method was compaction grouting <u>plus</u> underpinning. The insureds' engineer testified that underpinning would cost $29,250. He testified that compaction grouting would cost between $72,000 for subsurface grouting at five-foot intervals and $84,500 at two-foot intervals. Adding $29,250 and $72,000 totals $101,250, a mere $1,250 off the $100,000 mark. We cannot say that the jury award was contrary to the manifest weight of the evidence. Therefore, we affirm on this issue.

## Prejudgment Interest

Citizens argues that the trial court should not have awarded prejudgment interest to the insureds. Citizens contends that no payment was due for subsurface repairs absent a repair contract. It also argues that damages were not liquidated until the jury returned a verdict. We examine this part of the final judgment through the lens of de novo review. <u>Santini v. Cleveland Clinic Fla.</u>, 65 So. 3d 22, 34 (Fla. 4th DCA 2011).

"A claim becomes liquidated and susceptible of bearing prejudgment interest when a jury verdict has the effect of fixing the amount of damages." <u>Berloni S.p.A. v. Della Casa, LLC</u>, 972 So. 2d 1007, 1011 (Fla. 4th DCA 2008). "[W]here a

disputed contractual claim becomes liquidated by jury verdict as to the amounts recoverable, interest should be awarded <u>from the date the payment was due</u>." <u>Id.</u> (alternation in original) (emphasis added) (quoting <u>Celotex Corp. v. Buildex, Inc.</u>, 476 So. 2d 294, 295 (Fla. 3d DCA 1985)).

In <u>McKee</u>, we held that the policy requirement of a sinkhole repair contract before payment was due did not preclude McKee from filing suit. 151 So. 3d at 4. However, we also held that McKee had to contract for the sinkhole repairs before Tower Hill was obligated to pay any judgment. <u>Id.</u> Thus, we reversed an award of prejudgment interest because no payment was due until McKee executed a repair contract. <u>Id.</u> We stated:

> McKee's failure to enter into a contract for subsurface repairs was a factor outside Tower Hill's control that reasonably prevented payment. Section 627.70131(5)(a), Florida Statutes (2013), authorizes an award of prejudgment interest on "[a]ny payment of an initial or supplemental claim or portion of such claim made 90 days after the insurer receives notice of the claim, or made more than 15 days *after there are no longer factors beyond the control of the insurer which reasonably prevented such payment*, whichever is later." (Emphasis added). Therefore, the trial court's award of prejudgment interest on the subsurface damage award was premature.

<u>Id.</u> at 4 (alteration in original).

Interestingly, section 627.70131(5)(a) also provides that "[i]f there is a right to prejudgment interest, the insured shall select whether to receive prejudgment interest or interest [as delineated] under this subsection." This provision clarifies that section 627.70131(5)(a) is not necessarily a statutory source for prejudgment interest. Nevertheless, <u>McKee</u>'s result remains correct because Tower Hill had no payment obligation absent a contract for subsurface repairs.

Allstate Insurance Co. v. Martinez, 790 So. 2d 1151 (Fla. 3d DCA 2001), offers an analogous, and instructive, situation.  The Third District reviewed a judgment confirming an arbitration award and held that, where the insurance policy gave Allstate sixty days from the date of the appraisal award to make payment, prejudgment interest was to be calculated from sixty days after that award.  Id. at 1152; see also Aries Ins. Co. v. Hercas Corp., 781 So. 2d 429, 430 (Fla. 3d DCA 2001) (holding insured was entitled to prejudgment interest from the date of the appraisal award "as that is the date on which the damages were liquidated").  The Allstate policy provision allowing payment within sixty days after an appraisal award, which the Martinez court held was the liquidation date governing prejudgment interest, is analogous to the Citizens policy provision allowing payment upon execution of a repair contract.

In Martinez, the insured argued that he should get interest from an earlier date because Allstate used delaying tactics.  790 So. 2d at 1152 n.3.  The Third District rejected this plea; nothing in the record supported that accusation.  Id.  Neither does the record before us.  Nothing indicates that Citizens acted with an improper purpose in delaying payment.  "[N]either the merit of the defense nor the certainty of the amount of loss affects the award of prejudgment interest."  Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 215 (Fla. 1985).

In Citizens Property Insurance Corp. v. Alvarez, 40 Fla. L. Weekly D2428, D2429 (Fla. 2d DCA Oct. 30, 2015), we reversed a prejudgment interest award but made no mention of the need for a repair contract before payment was due.  Citizens claimed that McKee and Argonaut controlled as to prejudgment interest.  Alvarez, 40 Fla. L. Weekly at D2429.  We stated that "[w]e [were] not convinced that these

- 12 -

precedents [were] controlling." Id. We stated that the insureds did not raise the claim for prejudgment interest until after the jury verdict, the parties disputed the cost of repair, the jury instructions and verdict form asked the jury to decide the amount of loss by determining the cost to repair the damage, and the jury resolved the repair cost dispute and "liquidated the claim as of the date of the verdict." Id. We reversed the award of prejudgment interest because "[t]here simply [was] no factual determination establishing an earlier 'fixed date of loss' from which to calculate prejudgment interest." Id.[6]

In Amat, we cited Alvarez and applied its reasoning in reversing the prejudgment interest award. Amat, 41 Fla. L. Weekly at D450. We stated that "[f]or the purpose of assessing prejudgment interest, a claim becomes liquidated and susceptible of prejudgment interest when a verdict has the effect of fixing damages as of a prior date." Id. (quoting Argonaut, 474 So. 2d at 214). We held that because the insured did not request prejudgment interest until after the jury verdict, "and there was no indication that the jury was determining the amount of the loss for any date other than the date of the verdict," the trial court erred in awarding prejudgment interest. Id. at D450 (citing Alvarez, 40 Fla. L. Weekly at D2429); see also Blaha, 41 Fla. L. Weekly at D887. Although we held that the trial court erred in ordering Citizens to pay for subsurface repairs before the insureds executed a postjudgment contract for those repairs, we did not cite the repair contract requirement as a reason for reversing the prejudgment interest award. Id.

_____

[6]We did not rule out the possibility that a plaintiff could present such a claim to a jury in a way that might allow for prejudgment interest but held that the Alvarez plaintiffs failed to do so. Alvarez, 40 Fla. L. Weekly at D2429.

In this case, in contrast to Amat and Alvarez, the insureds' complaint requested prejudgment interest. However, as in Amat and Alvarez, the parties disputed the repair method and cost, the jury instructions asked the jury to decide the amount of loss without determining a date of loss, and there was no factual determination establishing an earlier fixed date of loss. Therefore, we reverse the trial court's award of prejudgment interest.

### Conclusion

We affirm the trial court's final judgment to the extent that a repair contract was not a condition precedent to filing a lawsuit for breach of contract. We also affirm the trial court's denial of the motion for a new trial on the amount of subsurface repair damages. We reverse that portion of the final judgment that requires Citizens to pay the judgment for subsurface repairs before the insureds execute a contract for those repairs. We also reverse the award of prejudgment interest on the subsurface damages award. On remand, the trial court shall enter an amended final judgment in accordance with this opinion and the provisions of the sinkhole endorsement to the insurance policy.

Affirmed in part, reversed in part, and remanded with directions.


KHOUZAM and CRENSHAW, JJ., Concur.

- 14 -