[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-14132

_____

RICARDO SANCHEZ,
as Personal Representative of the Estate of
Teresa Sanchez Quetglas,
ELIA BONFANTE,
as Personal Representative of the Estate of
Ana Gaitan Diaz,
FRANCISCO CORTES,
as Personal Representative of the Estate of
Margarita Cortes-Pardo,
JULIO LOPEZ-BERMEJO ROSSELLO,
as Personal Representative of the Estate of
Maria Lopez-Bermejo Rossello,

                                        Plaintiffs-Appellees,

*versus*

DISCOUNT ROCK & SAND, INC.,
a Florida Corporation,

                                        Defendant-Appellant,

CARLOS MANSO BLANCO,
individually,

                                        Defendant.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 4:18-cv-10097-KMM

————————————

Before WILLIAM PRYOR, Chief Judge, and LUCK and MARCUS, Circuit Judges.

LUCK, Circuit Judge:

This case stems from a tragic car accident that claimed the lives of four young women. The women's estates sued Carlos Manso Blanco, the driver who rear-ended their car, for negligence. And the estates sued Blanco's employer, Discount Rock & Sand, Inc., for negligently entrusting the company's truck to Blanco and for vicarious liability for Blanco's negligent driving. After the

estates and Blanco settled, the district court ordered the estates to file a stipulation of dismissal under Federal Rule of Civil Procedure 41(a), which they did. Based on the stipulation, the district court ordered the dismissal of the claim against Blanco. The remaining claims against Discount Rock went to trial, and the jury found the company liable and awarded nearly $12 million in damages to the estates.

Discount Rock appeals the judgment, arguing that: (1) it was entitled to judgment as a matter of law on the negligent entrustment claim; (2) the district court erred by instructing the jury that it could presume a rear-ending driver was negligent; and (3) the district court abused its discretion by allowing the estates to show the jury a demonstrative aid depicting the crash. After we issued a jurisdictional question, Discount Rock also moved to dismiss the appeal. Discount Rock argues that the stipulation was ineffective to dismiss the claim against Blanco because rule 41(a)(1)(A)(ii) requires all parties who appeared in the action to sign the stipulation, but Discount Rock didn't sign it. Thus, the company argues, the claim against Blanco was not dismissed and the district court's judgment was not final.

We first conclude that we have jurisdiction. Although the stipulation did not comply with rule 41(a)(1)(A)(ii), the district court's order dismissing the claim against Blanco satisfied rule 41(a)(2)—which allows a district court to dismiss an action by court order at a plaintiff's request. And on the merits, we conclude that: (1) Discount Rock was not entitled to judgment as a matter

of law on the negligent entrustment claim; (2) any error in instructing the jury on the rear-end-collision presumption was harmless; and (3) there was no reversible error in publishing the demonstrative aid. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In March 2018, four Spanish citizens vacationing in the Florida Keys were killed in an automobile accident. The four women were traveling northbound on U.S. Route 1 (the Overseas Highway) and stopped near mile marker 79 to turn left into a scenic viewing area. Two vehicles, driven by Cheyenne Del Okeyes and Eduardo Ponce, passed the women's Nissan Rogue sport utility vehicle on the righthand shoulder. But a third vehicle—a truck outfitted with a large tank holding water and sewage and hauling a port-a-potty—slammed into the Nissan. The truck, which was owned by Discount Rock and driven by its employee, Blanco, propelled the Nissan into oncoming traffic, into the path of a recreational vehicle driven by Daniel Pinkerton. All four women died at the scene.

The women's estates sued Blanco for negligence and Discount Rock for negligent entrustment and for vicarious liability for Blanco's negligence. The estates sought compensatory and punitive damages.

When Blanco and the estates settled, the district court "directed [them] to file a stipulation of dismissal of all claims signed by all [p]arties to the settlement pursuant to [r]ule 41(a)." So they filed a "Stipulation for Voluntary Dismissal," signed by both Blanco's

and the estates' counsel, that stipulated, "pursuant to Federal Rule of Civil Procedure 41(a)(1)(A), . . . to the voluntary dismissal of th[e] action only against [Blanco]." The district court then entered an order citing rule 41(a)(1)(A)(ii) before "adjudg[ing] that the [estates'] cause [be] hereby dismissed as to [Blanco]." Because the parties neither requested dismissal with prejudice nor indicated that the estates had previously dismissed their claim against Blanco, the district court ordered the dismissal to be without prejudice under rule 41(a)(1)(B). The district court also "retain[ed] jurisdiction to enforce the settlement agreement."

The remaining claims against Discount Rock went to trial. Discount Rock framed the accident as "unavoidable" and explained in its opening that it "d[id] not blame anyone in the Nissan for doing something wrong." The estates, on the other hand, told the jury that Blanco was an inexperienced and checkered driver, was undertrained to safely handle a truck of that size and weight, and was speeding, following too closely, and distracted—looking away from the road—right before the accident.

The jury heard from Discount Rock's owner, who admitted he didn't know about Blanco's past driving violations—for speeding, running a stop sign, and driving with an expired tag—and wouldn't have hired him had he known. The owner described having the dealership modify the truck to carry an aluminum tank with capacity for 300 gallons of water and 800 gallons of sewage (from cleaning port-a-potties)—for a combined 20,000-pound weight when full. But he didn't test the truck's braking or maneuverability

with the tank installed because he believed the dealer did—and because, he said, the "heavy duty" truck was designed to handle the same with or without the added weight. Nor did the owner require Blanco to complete any safety training with the truck (other than shadowing another driver for a period). The day of the accident, the truck was nearly full and weighed 19,500 pounds.

The jury also heard from Pinkerton, the recreational vehicle's driver. Pinkerton said he saw the women's Nissan slow to a stop with its turn signal on, at which point a black car swerved around it. Pinkerton then saw Blanco with his head down, "looking down with his hands down here," as the Discount Rock truck approached the Nissan "at a pretty good rate of speed." The jury saw a bodycam video in which Pinkerton informed a law enforcement officer at the scene that the "tanker truck" driver "wasn't paying attention."

Blanco testified too. He acknowledged his three prior traffic violations. He also confirmed he'd had neither a road test nor training for driving the truck, other than riding with the outgoing driver for a week and a half. But Blanco agreed that the truck "felt different than [Discount Rock's] old one," which explained why he was speeding when the accident happened. And he testified that he did "everything in [his] power" to brake and maneuver to the right once he saw the Nissan stopped ahead—but he "was being dragged," he said, and couldn't stop "because maybe [he] had too much weight from the water, plus the [port-a-potty]" that he was hauling. The tank "sort of influenced in dragging [him]" and

21-14132                Opinion of the Court                7

preventing him from stopping, he testified, "because it's very heavy, it weighs a lot."

Florida Highway Patrol Corporal Luis Perez likewise explained that, "on the road, it look[ed] like [Blanco] actually tried to go to the right" but couldn't avoid the collision "because [the truck] had too much . . . a lot of water, I believe it was a full tank of water in the back, all that inertia go[ing] forward when [Blanco] tried to go to the right." Perez also saw evidence that, besides swerving, Blanco tried to brake "[j]ust right before" the collision. And Perez confirmed that the Nissan was stopped for a legal left turn at the time of the accident.

The estates also presented the testimony of an accident reconstruction expert, William Fischer. Before Fischer was called, Discount Rock objected to his planned use of a PowerPoint demonstrative aid on two grounds. First, although Discount Rock had asked for the demonstrative aid ten days before trial, the estates disclosed the eighty-four-slide PowerPoint deck at 11:45 p.m. after the first day of trial, "not pursuant to th[e district c]ourt's deadlines." The estates' untimely disclosure, Discount Rock contended, hampered its defense. Its cross-examination "outline would look very different," it argued, had it seen the compilation—these slides, in this specific order—earlier, and perhaps it would've hired a competing expert. The district court initially described the estates' conduct as an "[eleven]th-hour ambush." But after the district court directed the parties to confer and zero in on Discount Rock's specific objections, Discount Rock conceded that all but four slides had

previously been disclosed.[1]  After pressing for specifics—and observing that Discount Rock was simply "throw[ing] the whole bowl of spaghetti on the wall [to] see if any of it sticks"—the district court overruled Discount Rock's timeliness objection.

Second, Discount Rock objected to a "misleading" and "confusing" accident-reconstruction animation in the PowerPoint—"a gross mischaracterization of the facts" that omitted the two vehicles that passed the women's Nissan before Blanco crashed into it. But the district court overruled this objection too, for three reasons.  First, the district court noted that "there ha[d] been some different testimony with respect to the number of cars that may or may not have gone around."  Second, the district court offered to "remind the jury" that "these demonstrative aids are not evidence." Third, Discount Rock could choose to address the omission during cross-examination.  For these reasons, the district court concluded that the animation "would still be more helpful than not for the jury."

During Fischer's testimony, the district court preemptively instructed the jury before publishing the demonstrative aid:

---

[1]  Discount Rock objected that, even if presenting previously disclosed material, "almost every single" slide had been changed since Fischer's deposition. But after the estates pointed out that the bulk of the objected-to changes were benign—like an added directional arrow, a complaint the district court called "laughable"—Discount Rock conceded that it had no objection "to any of the slides where all they've done is add[] the directional."

21-14132                 Opinion of the Court                        9

> Folks, you're going to see what is a demonstrative aid. It's not evidence in the case. It's presumably based on the witness's testimony based on the evidence that he has reviewed in the case. So just be careful that if—this document, as I said, is not going to be admitted as evidence—but just be careful that if you see anything on the demonstrative aid that is different than your recollection of what the evidence is in the case, it's the evidence that controls. So, if you see anything different—I mean, I'm not suggesting that there would be anything different—but if you do, just be careful and just make sure you understand it's not evidence in the case. It's a demonstrative aid, they're intended to help you, but if you see any difference, be guided by the evidence.

Fischer opined: (1) that Blanco was speeding before the crash; (2) that he "only steered prior to impact and did not brake"; and (3) that the women's Nissan—which had been stopped or moving slowly for "at least five seconds" before impact—would've been visible to "an attentive driver . . . for a sufficient amount of time to avoid actually impacting" it. Fischer also explained that the scenic viewing area into which the women were turning was paved, with no signs prohibiting a left turn—in fact, "all the pavement markings on the roadway were dashed and such that would allow a left turn"—and no signs prohibiting parking. On the day he inspected the area, Fischer said, several cars turned left into the area to stop, take photos, and enjoy the view.

Fischer then played the accident-reconstruction animation to "show the jurors the two impacts": the animation depicted a stationary Nissan, angled slightly leftward in the direction of a paved turn-off, a recreational vehicle approaching from the opposite direction, and finally a tanker truck barreling into and pushing the Nissan into a collision with the recreational vehicle. Afterward, the estates asked him:

> Now, this animation that we've just seen, I take it, your focus is on the three vehicles that were involved in some sort of a collision in the crash scene . . . . You don't show the vehicles, whether it was two, as some witnesses testified, or three vehicles, as the Florida Highway Patrolman testified, that passed without incident—passed the [women's] vehicle without incident; those aren't shown there, are they?

Fischer confirmed: "No, they're not. This is, essentially, just to show—give someone an understanding of how all these vehicles came together."

Still, Fischer expressly addressed the two passing vehicles. Before playing the animation, he told the jury that "at least two cars also traveling north behind the [Nissan] maneuvered around and to the right of the stopped [Nissan]." He displayed and discussed a slide with a still-image from the animation depicting the "[a]rea of other vehicles traveling around [the] stopped [Nissan]" (a superimposed dotted, "curved line that originates in the northbound lane from behind the stopped vehicle, and then it curves around and then, ultimately, re-enters the northbound lane"). And

he explained that he reviewed Del Okeyes's and Ponce's Florida Highway Patrol statements in preparing his expert report.

On cross-examination, Fischer was again asked about the missing vehicles in the animation. He acknowledged that "[t]he animation that [he] created left out two of the cars that were part of the sequence of events leading up to th[e] accident." But he disagreed with Discount Rock's characterization that the omitted vehicles had "direct involvement" with the women's Nissan and reiterated that "th[e] animation was strictly to show the interaction between the [Discount Rock truck's] impact into the rear of the Nissan and then the impact of the Nissan into the front of the [recreational vehicle]."

Finally, the jury heard from the drivers of both vehicles that passed the women's Nissan before the collision. Del Okeyes drove the first vehicle; she, like Pinkerton, testified that the Nissan gradually slowed to a stop with its blinker on. Del Okeyes told the jury that she slowed down and was "able to pass on the right without any issue" but also would've had enough time to stop behind the Nissan. After passing the Nissan, she saw a black car behind her pass too. She then saw "[a] big truck was coming up on the [Nissan] pretty fast, and it looked like he tried to avoid but didn't have enough time to stop, which he slammed into the [Nissan], which pushed them into oncoming traffic" and into the recreational vehicle.

Ponce—the driver of the black car that passed second—testified that he didn't see the stopped Nissan until Del Okeyes passed

it. He didn't have time to brake or use his turn signal, he said; instead, he "almost crashed" into the Nissan before swerving around it. Ponce thought the Nissan had stopped quickly. But he admitted he didn't know how long it'd been stopped—and Fischer testified that Ponce's testimony that the Nissan stopped abruptly was inconsistent both with data from the Nissan's black box and with Pinkerton's and Del Okeyes's statements. After passing the Nissan, Ponce saw in his rearview mirror "a car that was coming behind [him]"—it was "really big, the truck"—crash into the Nissan "really bad."

After the estates rested, Discount Rock moved for judgment as a matter of law on the estates' punitive damages claim, which the district court granted. Discount Rock then moved for judgment as a matter of law on the estates' negligent entrustment claim. In doing so, Discount Rock stipulated that "Blanco was acting within the course and scope of his employment at the time of th[e] accident"—in which case, it argued, with the punitive damages claim dismissed, the estates couldn't hold Discount Rock both directly and vicariously liable. The district court, "satisfied that [there was] sufficient evidence . . . on both claims[] to allow them to go to the jury," denied Discount Rock's motion.

At the charge conference, Discount Rock objected to a jury instruction on Florida's presumption of negligence when a driver rear-ends another vehicle. Discount Rock asserted that it's "a dissolving presumption [and,] once evidence has been introduced that it was an unavoidable accident or that there is [an]other

explanation, the presumption dissolves and it becomes a jury question." The district court overruled Discount Rock's objection and instructed the jury: "In a rear-end collision[,] a rebuttable presumption of negligence attaches to the driver of the rear vehicle. The presumption can be rebutted if the rear-end driver puts forth evidence establishing the lead driver's negligence contributed to the accident." Discount Rock also proposed and agreed to a verdict form giving the jury three options for allocating liability for the collision: Discount Rock, Blanco, and Pinkerton.

In closing, Discount Rock again asserted that the accident was unavoidable—the stretch of highway was unsafe, two cars had to swerve around the women's Nissan because they didn't have time to stop, and Blanco "was unable to avoid the collision" because inertia caused by "the weight of the truck" prevented him from swerving—and that Discount Rock did nothing wrong in entrusting the truck to Blanco in light of its safety policies. Discount Rock challenged Fischer's credibility because the PowerPoint animation omitted the cars that passed the women's Nissan. And Discount Rock argued that Pinkerton, Del Okeyes, and Ponce were all partially responsible for the accident.

The jury returned a verdict for the estates, awarding damages totaling nearly $12 million. The jury found Discount Rock both vicariously liable for Blanco's negligence (the jury apportioned seventy-five percent fault to him) and twenty-five percent responsible due to its own negligence. The district court entered judgment on the jury's verdict against Discount Rock.

Discount Rock then moved for judgment as a matter of law, for a new trial, or for remittitur. It argued that the district court should've entered judgment as a matter of law in its favor on the estates' negligent entrustment claim, shouldn't have instructed the jury on presuming negligence, and abused its discretion in allowing publication of Fischer's demonstrative aid. The district court denied Discount Rock's motion. This is Discount Rock's appeal.

## JURISDICTION

We begin, as we must, by assuring ourselves of our jurisdiction. *Cavalieri v. Avior Airlines C.A.*, 25 F.4th 843, 848 (11th Cir. 2022) ("A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises." (citation omitted)). We issued a jurisdictional question asking the parties to address whether the rule 41 stipulation voluntarily dismissing Blanco "was effective, given that it appeared to be signed only by counsel for the [estates] and counsel for Blanco and did not appear to be signed by counsel for Discount Rock."

We asked that question because, if the stipulation was ineffective to dismiss Blanco, then the estates' claim against him remains pending. And if the estates' claim against Blanco is still pending, then the district court's order entering judgment against Discount Rock isn't final because it didn't dispose of all claims against all parties. "Ordinarily, a final judgment resolves conclusively the substance of all claims, rights, and liabilities of *all parties* to an action." *Collar v. Abalux, Inc.*, 895 F.3d 1278, 1283 (11th Cir. 2018)

(emphasis added) (citing Fed. R. Civ. P. 54(b)); *see also* 28 U.S.C. § 1291 (conferring "jurisdiction of appeals from all [district courts'] final decisions").

In response to our jurisdictional question, the estates urge us to follow the Fifth Circuit in *National City Golf Finance v. Scott*, 899 F.3d 412 (5th Cir. 2018), and conclude that "only the dismissed defendant need sign the [rule 41] stipulation," *id.* at 415 n.3. And if not, the estates argue, we should treat Blanco as having been voluntarily dismissed by court order under rule 41(a)(2). Finally, the estates address a point we didn't raise: whether the stipulation was effective despite not dismissing the estates' entire action. On that issue, the estates argue that we should apply our holding in *Plains Growers, Inc. ex rel. Florists' Mutual Insurance Co. v. Ickes-Braun Glasshouses, Inc.*—that a rule 41(a)(1)(A)(i) notice can dismiss one defendant while leaving "the action against another defendant" pending, 474 F.2d 250, 253 (5th Cir. 1973)—to the rule 41(a)(1)(A)(ii) stipulation here.[2]

Discount Rock, for its part, argues that a rule 41(a)(1)(A)(ii) stipulation "must be signed by *all* parties who have appeared in the action," not just the parties that settled. Discount Rock also argues that we shouldn't treat the district court's order as a rule 41(a)(2) dismissal for three reasons: (1) because the estates never moved for an order of dismissal (as to which Discount Rock would've had

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

an "opportunity to be heard"); (2) because the order "[wa]s devoid of any analysis that Blanco was being dropped 'on just terms'"; and (3) because Discount Rock was in fact prejudiced by Blanco's dismissal. Finally, Discount Rock asserts that *Plains Growers* "expressly limited its ruling" to the rule 41(a)(1)(A)(i) notice context. Extending *Plains Growers*' holding to permit dismissal of a single defendant—rather than a plaintiff's "entire action"—via rule 41's other avenues, Discount Rock says, would conflict with the rule's plain language, render Federal Rule of Civil Procedure 21 superfluous, and contradict the 1946 advisory committee note to rule 41 "reflect[ing] an intention to 'prevent[] unlimited dismissal.'"

Rule 41(a) sets out three avenues for voluntary dismissal of "an action": (1) a rule 41(a)(1)(A)(i) notice filed "before the opposing party serves either an answer or a motion for summary judgment"; (2) a rule 41(a)(1)(A)(ii) stipulation "signed by all parties who have appeared"; or (3) a rule 41(a)(2) court order dismissing the action "at the plaintiff's request" and "on terms that the court considers proper." Fed. R. Civ. P. 41(a). Although the estates' stipulation was ineffective under rule 41(a)(1)(A)(ii) because Discount Rock didn't sign it,[3] we agree with them that the district court's order satisfied rule 41(a)(2)'s requirements and so was effective to dismiss Blanco. Here's why.

---

[3] After the parties briefed and argued this appeal, we held in *City of Jacksonville v. Jacksonville Hospitality Holdings, L.P.* that a rule 41(a)(1)(A)(ii) stipulation requires the signatures of "all parties who have appeared in the lawsuit," not just "all parties involved in the dismissal." 82 F.4th 1031, 1034 (11th Cir. 2023).

First, the stipulation—which alerted the district court that the estates sought to dismiss Blanco—sufficed as "the plaintiff[s'] request" for a court-ordered voluntary dismissal. Rule 41(a)(2), by its plain language, doesn't require a motion. *Cf. Pontenberg v. Bos. Sci. Corp.*, 252 F.3d 1253, 1256 n.1 (11th Cir. 2001) ("[A] district court need not await a motion from a plaintiff to permit voluntary dismissal and may act sua sponte to dismiss under [r]ule 41(a)(2)."); *see also Morris v. City of Hobart*, 39 F.3d 1105, 1109–10 (10th Cir. 1994) ("Rule 41(a)(2) does not require that the plaintiff's request for dismissal take any specific form; it requires only that the court approve such a request for dismissal."). And, several times, we've approved dismissal orders that treated rule 41(a)(1)(A) notices and stipulations as requests for a rule 41(a)(2) court order. *See Pontenberg*, 252 F.3d at 1255–56 & n.1 (notice); *Serendipity at Sea, LLC v. Underwriters at Lloyd's of London Subscribing to Pol'y No. 187581*, 56 F.4th 1280, 1284 (11th Cir. 2023) (stipulation); *Druhan v. Am. Mut. Life*, 166 F.3d 1324, 1325 n.3 (11th Cir. 1999) (stipulation); *see also Plains Growers*, 474 F.2d at 253 (observing, in dicta, that "[w]here notice of dismissal under [r]ule 41(a)(1) fails, the notice may be considered a motion under [r]ule 41(a)(2) and the court may order the dismissal").

Second, the district court's order complied with the requirement of rule 41(a)(2) in "adjudg[ing] that the [estates'] cause [wa]s . . . dismissed as to" Blanco because it set forth the terms of the dismissal. The district court ordered dismissal without prejudice because the parties neither requested otherwise nor "informed the [c]ourt whether [the estates] previously dismissed any federal

or state court action based on or including the same claim." And the district court "retain[ed] jurisdiction to enforce the settlement agreement" between the estates and Blanco. Both of these are "terms that the [district] court consider[ed] proper," which is all rule 41(a)(2) requires. Fed. R. Civ. P. 41(a)(2).

Discount Rock's arguments to the contrary are unpersuasive. First, it argues that the district court's order was "devoid of any analysis" that the terms of Blanco's dismissal were proper. But on its face, the order shows that the district court analyzed whether the dismissal's terms were proper. The order expressly states the district court "consider[ed] . . . the [s]tipulation[ and] the pertinent portions of the record." Then, only after "being . . . fully advised in the premises," the district court ordered Blanco's dismissal and specified the terms.

Second, Discount Rock argues that even if we treat the district court's order as a dismissal order under rule 41(a)(2), it still did not dismiss an "action" because it didn't dismiss the entire case. But in *Plains Growers*, where we addressed a rule 41(a)(1)(A)(i) notice, we held that a plaintiff can dismiss one defendant under rule 41(a) "even though the action against another defendant would remain pending." 474 F.2d at 253. That is what happened here—the district court's order dismissed the action as to Blanco, "even though the action against [Discount Rock] remain[ed] pending." *Id.*

Discount Rock is mistaken that *Plains Growers* "limited its ruling" to rule 41(a)(1)(A)(i) and thus "action" should mean the

entire case for rule 41(a)(2) dismissal orders.  Rules 41(a)(1)(A)(i), (a)(1)(A)(ii), and (a)(2) all use the term "action."  Although we decided *Plains Growers* in the context of a rule 41(a)(1)(A)(i) notice of dismissal, our holding hinged on interpreting the word "action" as used throughout rule 41(a)—not on any language in the dismissal-by-notice subrule, specifically.  *See id.* at 254–55 (rejecting the argument that "'action' in [rule 41(a)] . . . denotes the entire controversy" and adopting "the 'better view' . . . that a [r]ule 41(a) notice or motion can be effected against less than all of the defendants").  Indeed, we found

> little merit in an argument that the [district] court could not dismiss the action as to less than all defendants upon motion, and yet there is nothing in the [r]ule to indicate an intent to make the word "action" mean "all" in 41(a)(1) and mean less than "all" in 41(a)(2).

*Id.* at 254; *see also* Fed. R. Civ. P. 41(a)(1)(A) (setting out ways a "plaintiff may dismiss an *action* without a court order" (emphasis added)); Fed. R. Civ. P. 41(a)(2) (authorizing dismissal of "an *action*" by court order (emphasis added)).  And in *Oswalt v. Scripto, Inc.*, which involved a filing dismissing one of several defendants that we found "tantamount to a [rule 41(a)(1)(A)(ii)] stipulation," we recognized that *Plains Growers* "rejected" the view "that 'action' in [r]ule 41 means the entire controversy."  616 F.2d 191, 194–95 (5th Cir. 1980).

We reject Discount Rock's invitation to give "action" a different meaning for rule 41(a)(2) than it has for rule 41(a)(1)(A)(i)

(*Plains Growers*) or rule 41(a)(1)(A)(ii) (*Oswalt*).  We generally "presume that 'words or phrases bear the same meaning throughout a text.'" *Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154, 1159 (11th Cir. 2021) (cleaned up) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 25, at 170, 173 (2012)).  "It would be odd if, in two consecutive subsections of [rule 41(a)], . . . the same words were read to mean one thing in the first subsection but another in the second." *Id.*  Discount Rock points us to nothing from rule 41(a)'s context rebutting the general presumption that the same word in the same rule means the same thing.  *See id.* ("All else being equal, we prefer a reading of the second [subsection] that coheres with binding precedent as to the first.").[4]

The district court's order dismissing Blanco but leaving the estates' claims against Discount Rock pending satisfied rule 41(a)(2)'s requirements and so was effective to dismiss Blanco.  And with Blanco dismissed, the judgment entered against Discount

---

[4] Discount Rock directs our attention, by notice of supplemental authority, to *Rosell v. VMSB, LLC*, 67 F.4th 1141 (11th Cir. 2023), which it says "supports its position that Blanco's 'voluntary' dismissal pursuant to [r]ule 41 was procedurally ineffective."  We did dismiss the appeal in *Rosell* for lack of jurisdiction because "the parties . . . attempted to use [r]ule 41(a) to dismiss a single count and not an entire lawsuit." *Id.* at 1143.  But Discount Rock overlooks *Rosell*'s footnote two, which "recognized that [r]ule 41(a) allows a district court to dismiss all claims against *a particular defendant*," an "exception (if it can be called that) [that] is compatible with the rule's text because[,] in a multi-defendant lawsuit, an 'action' can refer to all the claims against one party." *Id.* at 1144 n.2 (citations omitted).

21-14132                Opinion of the Court                    21

Rock resolved all claims against all remaining parties—making it final. We have jurisdiction.

## DISCUSSION

Turning to the merits, Discount Rock raises three issues on appeal. First, Discount Rock asserts that the district court erred in denying its motions for judgment as a matter of law on the estates' negligent entrustment claim. Second, Discount Rock argues that the district court erred in instructing the jury on Florida's rebuttable presumption that a rear-ending driver is negligent. Third, Discount Rock contends that the district court abused its discretion in allowing the estates to publish an untimely and misleading demonstrative aid.

### Negligent Entrustment

Discount Rock argues, first, that the district court erred in denying its motions for judgment as a matter of law as to the estates' negligent entrustment claim. It contends that, under long-standing Florida precedent, a plaintiff can't pursue both vicarious liability and negligent entrustment claims against an employer once the employer has admitted that the allegedly negligent employee was acting in the course and scope of his employment.[5]

_____

[5] We review de novo a district court's ruling on a motion for judgment as a matter of law. *Mamani v. Sánchez Bustamante*, 968 F.3d 1216, 1230 (11th Cir. 2020). "Our sole consideration is whether the evidence sufficiently supports the verdict," viewing all the evidence and drawing all reasonable inferences in the nonmovant's favor. *Id.* (citations omitted).

Under Florida law, an employer "may be held liable for injury to a third party caused by" its employee's negligent conduct "while acting in the scope of his authority." *Mallory v. O'Neil*, 69 So. 2d 313, 314 (Fla. 1954). Generally, where "a plaintiff alleges and a defendant admits that the alleged torts took place during the course and scope of employment, employer liability can only be pursued on the basis of [vicarious liability] and not on the basis that the employer was negligent." *Delaurentos v. Peguero*, 47 So. 3d 879, 882 (Fla. Dist. Ct. App. 2010) (citing *Mallory*, 69 So. 2d at 315).

But two exceptions to the general rule apply where a direct-liability theory "would impose additional liability" on the employer beyond vicarious liability for its employee's negligence. *Clooney v. Geeting*, 352 So. 2d 1216, 1220 (Fla. Dist. Ct. App. 1977). First, an employer can be separately liable—in addition to vicarious liability—where there's a pending punitive damages claim. *Id.* Second, an employer may be separately liable where the alleged direct liability takes the form of negligent entrustment. *See id.*

The *Clooney* court gave the mine-run example of the second exception. An employer will be separately liable for negligent entrustment if the "owner or authorized custodian of a motor vehicle . . . knows that the vehicle has defective brakes," it allows an employee "who is not aware of this dangerous condition to use [the vehicle], and because of the bad brakes an accident occurs." *Id.* "If the driver were found not to be negligent"—because he didn't know about the defective brakes—the employer "could not be held vicariously liable. So the means of imposing liability on the

[employer] would be through [its] own negligence of lending the car with bad brakes." *Id.*

Here, the district court granted Discount Rock's motion for judgment as a matter of law as to the estates' punitive damages claim so that claim couldn't support sending both the estates' direct and vicarious liability theories to the jury. But the estates also alleged a negligent entrustment claim and provided evidence that Discount Rock knew of its truck's dangerous condition.

The jury heard evidence that Discount Rock's owner had the truck Blanco was driving modified to carry an 1,100-gallon aluminum tank. The owner testified that, with a full tank, the truck's combined weight was 20,000 pounds—and Fischer testified that the truck was nearly full the day of the accident, weighing around 19,500 pounds. The jury also heard evidence that Discount Rock's owner never tested the truck's brakes or maneuverability after the tank was installed—believing that the dealership tested it and that the "heavy duty" truck would handle the same as modified. And Discount Rock's owner admitted that he didn't train Blanco to operate the modified truck, instead only having Blanco shadow the outgoing driver for a week or two.

At the same time, Blanco testified that the modified truck "felt different than [Discount Rock's] old one." He told the jury that he did "everything in [his] power" to brake and maneuver to the right but "was being dragged" and couldn't stop "because maybe [he] had too much weight from the water, plus the [port-a-potty] that [he] was [hauling]." Blanco also testified that the

aluminum tank "sort of influenced in dragging [him]" and preventing him from stopping "because it's very heavy, it weighs a lot." Florida Highway Patrol Corporal Perez echoed this testimony, explaining that the roadway evidence suggested that Blanco "actually tried to go to the right" to bypass the Nissan but couldn't "because [the truck] had too much . . . a lot of water, I believe it was a full tank of water in the back, all that inertia go[ing] forward when [Blanco] tried to go to the right."

Discount Rock seized on this explanation in its closing argument. It told the jury that the accident was "unavoidable" partly because Blanco "was unable to avoid the collision" when inertia caused by "the weight of the truck" prevented him from swerving around the Nissan. Indeed, Discount Rock specifically hearkened back to Blanco's testimony about "being pulled," and to Perez's testimony that "inertia from the water in the tank dragged the truck away." Discount Rock urged the jury not to hold it or Blanco responsible—pointing instead to Pinkerton's, Del Okeyes's, and Ponce's responsibility for the accident.

As Discount Rock's closing argument demonstrates, this case is essentially the paradigm example of negligent entrustment. There was sufficient evidence for the jury to find, as *Clooney* envisioned, that Discount Rock "kn[ew] that the vehicle ha[d]" a dangerous condition yet "allow[ed] one who [wa]s not aware of this dangerous condition to use it," and an accident occurred because of that condition. *See Clooney*, 352 So. 2d at 1220. Because Discount Rock could be separately liable for entrusting the truck to Blanco

21-14132                Opinion of the Court                25

in addition to being vicariously liable for Blanco's negligence, the district court did not err in denying Discount Rock's motion for judgment as a matter of law on the negligent entrustment claim.

*Rebuttable Presumption of Negligence*

Next, Discount Rock argues that the district court erred in instructing the jury on Florida's presumption that a driver who rear-ends another vehicle was negligent. According to Discount Rock, the "presumption dissolves when there is evidence that fairly and reasonably tends to show that the presumption of negligence is misplaced"—which it says it presented here. And the district court's error wasn't harmless, Discount Rock argues, "because the instruction essentially guaranteed a verdict for" the estates.[6]

In Florida, it's well settled that a "rebuttable presumption of negligence . . . attaches to the rear driver in a rear-end collision." *Clampitt v. D.J. Spencer Sales*, 786 So. 2d 570, 572 (Fla. 2001); *accord, e.g.*, *Gulle v. Boggs*, 174 So. 2d 26, 28 (Fla. 1965); *Birge v. Charron*, 107 So. 3d 350, 353 (Fla. 2012). The question here is whether it was error to instruct the jury on the presumption.

---

[6] "We review jury instructions de novo to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party but give the district court wide discretion as to the style and wording employed." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014) (cleaned up). We will reverse "where we are left with a substantial and ineradicable doubt as to whether the district court properly guided the jury." *Id.* (cleaned up).

Florida recognizes two types of rebuttable presumptions: those "affecting the burden of *producing* evidence" (often called vanishing presumptions) and those "affecting the burden of *proof.*" Fla. Stat. § 90.302 (emphases added); *accord Universal Ins. Co. of N. Am. v. Warfel*, 82 So. 3d 47, 53–54 (Fla. 2012). Vanishing presumptions are "established primarily to facilitate the determination of the particular action in which the presumption is applied"; presumptions affecting the burden of proof serve "to implement public policy." Fla. Stat. §§ 90.303–.304. Under either type, "a directed verdict on a presumed fact" is appropriate "if such fact goes unrebutted." *Warfel*, 82 So. 3d at 52.

"The fundamental difference between the two" is what happens "in the face of rebutting evidence: the former requires the presumption to vanish, whereas the latter still presents the presumption to the trier of fact to decide if the contradicting evidence overcomes the presumption." *Id.* So a jury never hears about a vanishing presumption: either the district court directs a verdict on the issue or, if rebutting evidence is produced, then the presumption "*drop[s] out of the case*" and "the issue is determined on the evidence just as though no presumption had ever existed." *Id.* at 51–52 (citations omitted); *accord Pub. Health Tr. of Dade Cnty. v. Valcin*, 507 So. 2d 596, 600 (Fla. 1987) (explaining that, once a vanishing presumption is rebutted, issues are resolved "as in a typical case," and "[t]he jury is never told of the presumption").

Florida's presumption that a rear-ending driver was negligent is a vanishing presumption—meaning a jury shouldn't hear

21-14132                Opinion of the Court                    27

about it. *Birge*, 107 So. 3d at 359 n.16; *Gulle*, 174 So. 2d at 28–29. But the district court here instructed the jury: "In a rear-end collision, a rebuttable presumption of negligence attaches to the driver of the rear vehicle. The presumption can be rebutted if the rear-end driver puts forth evidence establishing the lead driver's negligence contributed to the accident." Thus, we agree with Discount Rock that the district court erred by instructing the jury on the presumption over Discount Rock's objection. *See, e.g., DiGregorio v. Indus. Supply Corp. of Orlando*, 438 F.2d 303, 305 (5th Cir. 1971) ("[T]his presumption is not the proper matter of a charge to the jury under any circumstances."); *Baker v. Deeks*, 176 So. 2d 108, 109 (Fla. Dist. Ct. App. 1965) ("[I]t is improper to instruct the jury on the presumption of negligence.").

Still, we conclude that the jury-instruction error was harmless because the district court didn't "misstate the law or mislead the jury *to the prejudice of the objecting party*" (Discount Rock). *See Bhogaita*, 765 F.3d at 1285 (emphasis added and citation omitted). That's because Discount Rock never rebutted the presumption.

Florida courts have recognized four kinds of rebutting evidence in rear-end-collision cases: "(1) a mechanical failure in the rear driver's vehicle, (2) the lead driver's sudden stop, (3) the lead driver's sudden lane change, and (4) the lead driver's illegal or improper stop." *Fonger v. Nall*, 286 So. 3d 332, 333 (Fla. Dist. Ct. App. 2019) (citation omitted); *see also Alford v. Cool Cargo Carriers, Inc.*, 936 So. 2d 646, 650 (Fla. Dist. Ct. App. 2006) ("In the[ latter three] instances, the purpose for the presumption is not served because

the driver of the lead vehicle was a contributing cause of the collision . . . .").  Discount Rock argues that it presented rebuttal evidence in two forms.  First, it points to evidence that Del Okeyes and Ponce "illegally and unexpectedly took evasive action onto the shoulder" to avoid hitting the women's Nissan, arguing that it was "an unavoidable accident precipitated by the sudden and unexpected actions of the two vehicles immediately ahead of" Blanco's truck.  Second, Discount Rock relies on evidence that the women's "unexpected stop on a busy two-lane highway"—not "at an intersection or red light" but instead while "attempting to cross traffic into a scenic area"—caused Del Okeyes and Ponce "to take evasive action" in the first place.

But Del Okeyes and Ponce's evasive action is a non-starter. To rebut the presumption, Discount Rock had to show *"the driver of the lead vehicle was a contributing cause of the collision." Alford,* 936 So. 2d at 650 (emphasis added); *see also Fonger,* 286 So. 3d at 333 (identifying "lead driver's" conduct that can rebut presumption). Neither Del Okeyes nor Ponce was the "lead driver" in the collision.

As for evidence of the Nissan's "unexpected stop," "[i]t is well settled that a sudden stop, without more, is insufficient to overcome the presumption of negligence." *Clampitt,* 786 So. 2d at 575.  Instead, what's required is evidence of "a sudden stop by the [lead] driver at a time and place where it could not reasonably be expected by the following driver."  *Id.* at 574 (citation omitted)

(contrasting such evidence with "abrupt and *arbitrary* . . . 'gotcha' stop" in *Eppler v. Tarmac America, Inc.*, 752 So. 2d 592 (Fla. 2000)).

So even if Discount Rock provided evidence that the women's Nissan stopped suddenly—despite Fischer's testimony that the Nissan was stopped or moving slowly for "at least five seconds" before impact, Pinkerton's and Del Okeyes's statements that the Nissan gradually slowed to a stop, and Ponce's admission that he didn't know how long the Nissan had been stopped—that's not enough to rebut the presumption. The stop also had to be "at a time and place where it could not reasonably be expected by" Blanco. *Id.* (citation omitted).

And that's simply not the case here. The undisputed evidence showed that the turn into the scenic viewing area was both legal and expected. No signs prohibited drivers from turning into or parking at the scenic viewing area. In fact, Perez testified that Florida law didn't prohibit the left turn the women were waiting to make, and his belief that the turn was unsafe didn't transform it into illegal or unexpected conduct. Further, the roadway markings where the women were stopped—which "were dashed and such that would allow a left turn"—showed that turns could be expected into the scenic viewing area. There was thus no jury question about whether Blanco should have reasonably expected the women's vehicle to stop. *Cf. id.* at 575 (concluding stop for turn was reasonably expected on two-lane road bordered by businesses and residential areas "all of which maintain[ed] entrances and exits on the roadway"); *Wright v. Ring Power Corp.*, 834 So. 2d 329, 331

(Fla. Dist. Ct. App. 2003) ("[I]t was reasonable for Datson to expect Wright's car to stop suddenly when attempting to turn left onto the highway where there was no traffic signal requiring the highway traffic to stop."); *Hunter v. Ward*, 812 So. 2d 601, 602–04 (Fla. Dist. Ct. App. 2002) (concluding stop for turn was reasonably expected from inside lane of four-lane road at "a break in the grass median designed for turning").

In short, Discount Rock didn't produce evidence rebutting the presumption that Blanco was negligent when he rear-ended the Nissan—meaning the district court, had it been asked, should've directed a verdict in the estates' favor rather than giving the issue of Blanco's negligence to the jury. *See, e.g., Birge*, 107 So. 3d at 353 ("Unless this presumption is rebutted, the beneficiary of the presumption is entitled to judgment thereon as a matter of law."); *Fonger*, 286 So. 3d at 334 ("[I]f the stop occurs at a place where it was to be expected, the presumption of negligence is not rebutted, and the plaintiff is entitled to a directed verdict as to the rear driver's negligence." (citation omitted)). Thus, not only was the jury-instruction error harmless because the estates were entitled to a directed verdict, *see Bhogaita*, 765 F.3d at 1285, but Discount Rock actually *benefitted* from that error by getting an unearned second bite at the negligence-issue apple. Any jury-instruction error was an "error without injury" and not reversible because "[t]he submission to the jury, albeit under an erroneous standard, was more than the defendant was entitled to." *See Charleston Nat'l Bank v. Hennessy*, 404 F.2d 539, 543–44 (5th Cir. 1968) ("The instruction did not correctly state the law, but the error was without injury" where the

rear-ending driver's evidence to rebut the presumption of negligence "never rose above a scintilla at most, conjecture and speculation at least.  The trial court should have instructed the jury that the presumption of negligence required a verdict for the plaintiff.").

*Demonstrative Aid*

Finally, Discount Rock argues that the district court abused its discretion in permitting Fischer to publish an accident-reconstruction animation contained in his demonstrative aid Power-Point.[7]  Discount Rock asserts that the district court abused its discretion because the animation was untimely and "patently false and misleading."

As to timeliness, Discount Rock contends that the animation was created after Fischer's deposition and only disclosed by the estates late on "the night before [Fischer] was to testify."  But even assuming that Discount Rock is right, it has not shown that any error substantially prejudiced its defense.  Discount Rock conceded that all but four slides in Fischer's PowerPoint had been previously disclosed in discovery, with only minor edits.  And Discount Rock had ample opportunity to cross examine Fischer about the Power-Point, including that it omitted vehicles from the animation.  *Cf.*

---

[7] We review a district court's decision to allow use of a demonstrative aid for abuse of discretion.  *Bhogaita*, 765 F.3d at 1290–91.  We will reverse for a new trial based on an evidentiary error "only in cases where substantial prejudice exists." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1259 (11th Cir. 2004) (citation omitted).

*Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001) (holding that, even if district court should have excluded expert testimony, any error was harmless partly because the objecting parties "had ample opportunity to cross-examine" the expert about his assumptions).

Discount Rock also argues that the animation mischaracterized the facts because it "inexplicably . . . erased two of the vehicles" involved in the lead-up to the collision—thereby "impl[ying] that the Discount Rock truck had a wholly unobstructed view of [the] stopped Nissan, and was sufficiently behind [it] to avoid a collision, but nevertheless rear-ended it"—which was "purposefully misleading[] and highly prejudicial." Discount Rock contends that the district court should've excluded the video under Federal Rule of Evidence 403 as "inherent[ly] confusing" and "misleading."

But Discount Rock hasn't shown that the animation was "inherent[ly] confusing" or "misleading." First, Fischer repeatedly referenced the missing vehicles during his testimony about the animation. He mentioned them before he played the animation, informing the jury that "at least two cars" passed on the shoulder before the collision. He mentioned them after he played the animation, when he displayed and discussed a PowerPoint slide depicting the passing vehicles' path around the Nissan. He also told the jury that he'd reviewed Del Okeyes's and Ponce's statements to the Florida Highway Patrol while preparing his expert report (and testified that Ponce's statement conflicted with the black-box and other witnesses' evidence). And Fischer acknowledged and explained—on both direct and cross-examination—that the passing

vehicles didn't appear because the animation "was strictly to show" the impacts between the Nissan, Discount Rock's truck, and the recreational vehicle.

And second, Del Okeyes and Ponce testified *after* Fischer testified—meaning that, after seeing Fischer's animation, the jury heard testimony directly addressing the roles the passing vehicles played in the events the day of the collision. In sum, the district court didn't abuse its discretion in allowing the estates to publish Fischer's accident-reconstruction animation because the animation wasn't so "confusing" or "misleading" that rule 403 should've operated to exclude it. *Cf. Bhogaita*, 765 F.3d at 1291 (emphasizing that district court's "discretion is particularly broad with respect to [r]ule 403 determinations"); *cf. also Wright v. CSX Transp., Inc.*, 375 F.3d 1252, 1261 (11th Cir. 2004) (clarifying that Seventh Circuit case upon which party relied to argue train-light demonstration should've been excluded "actually held . . . that when a demonstration . . . differs from the actual conditions of the collision, the trial court has the discretion whether to admit it and allow the differing conditions to be highlighted on cross-examination," which was "exactly what happened [t]here").

## CONCLUSION

We have jurisdiction over Discount Rock's appeal because the district court's order dismissing Blanco satisfied Federal Rule of Civil Procedure 41(a)(2), and so the district court's entry of judgment on the jury's verdict was final.

As to the merits, the district court didn't err in denying judgment as a matter of law for Discount Rock on the estates' negligent entrustment claim because there was sufficient evidence for the jury to find that Discount Rock negligently entrusted Blanco with the modified truck.  And even though the district court erred in instructing the jury on Florida's rebuttable presumption that a rear-ending driver was negligent, that error wasn't "to the prejudice of" Discount Rock, *see Bhogaita*, 765 F.3d at 1285, because Discount Rock failed to produce evidence rebutting the presumption.  Finally, any untimely disclosure of the demonstrative aid didn't substantially prejudice Discount Rock, and the district court didn't abuse its discretion in allowing the demonstrative aid to be published because it wasn't so "confusing" or "misleading" that it should've been excluded under Federal Rule of Evidence 403.  The district court's entry of judgment on the jury verdict for the estates is therefore **AFFIRMED.**